415 F.2d 851
 Elenore PRED and Stanley Etersque, Plaintiffs-Appellants,
v.
BOARD OF PUBLIC INSTRUCTION OF DADE COUNTY, FLORIDA, a body corporate, Dr. Peter Masiko, Jr., Ambrose Garner and Dr. John L. Forbes, Defendants-Appellees.
 No. 26576.
 United States Court of Appeals Fifth Circuit.
 September 9, 1969.
 
 Beverly Gurevitz, Tobias Simon, Miami, Fla., for appellants.
 Kenneth L. Ryskamp, Miami, Fla., Earl Faircloth, Atty. Gen. of Florida, Tallahassee, Fla., Bolles, Goodwin, Ryskamp & Ware, Miami, Fla., for appellees.
 Before JOHN R. BROWN, Chief Judge, and GEWIN and GOLDBERG, Circuit Judges.
 JOHN R. BROWN, Chief Judge:
 
 
 1
 This is another monument to needless waste of lawyer and Judge time and, perhaps more important, client money. For now, 14 months later, the case must go back to start the normal process of discovery leading to the production of facts or the demonstrated lack of them on which, either before or after a conventional trial, the real merits of the case will be determined. This is but a different prelude to the common refrain on the high mortality rate to a dismissal under F.R.Civ.P. 12(b) for failure to state a claim.[1] To the usual perils should be added the unsoundness — both administratively and substantively — of trying, in the orbital atmosphere of this dynamic era, to resolve new, but serious, questions of constitutional law on barebones pleadings. Courts ought not to be pulled into academic exercises on a case that factually may never be. Byers v. Byers, 5 Cir., 1958, 254 F.2d 205. Courts ordinarily should grapple with these problems on a factual record. Public Affairs Associates, Inc. v. Richover, 1962, 369 U.S. 111, 82 S.Ct. 580, 7 L.Ed.2d 604.
 
 
 2
 Not following these principles, the District Judge, by an unrevealing order that is in no way illumined by the slightest indication of his reasons, dismissed a complaint[2] charging that the public school authorities purposefully declined to accord a specific status — renewal of employment contract and granting tenure — to the plaintiff-teachers because of the exercise by the teachers of First Amendment rights of speech and association in support of causes opposed by these state school authorities. Such dismissal was too quick, to soon, too enigmatic, so we reverse.
 
 
 3
 The plaintiffs, Etersque and Elenore Pred, were teachers in the mathematics and English departments in the Miami-Dade County Junior College operated by the defendants.[3] Each was in his third year of teaching under an annual contract and was eligible for a "continuing contract" tantamount to "tenure" beginning with the fourth year if he met the requirements of § 231.36, Florida Statutes, F.S.A.[4]
 
 
 4
 With a factual specificity that more than met the Rules' requirements (see note 1, supra), they alleged that each was a competent teacher satisfying all the statutory requirements for a fourth year contract tantamount to tenure.[5]
 
 
 5
 The complaint then went on to charge with like directness that the refusal of the authorities to grant each a fourth year contract was in violation of Florida law, the school's own policies, and, important here, Federal laws and Constitution.[6] Again exceeding the demands of the Rules, the complaint spelled out both the activities[7] — participation by each in the Dade County Classroom Teachers' Association, Inc., and energetic advancement by Mrs. Pred in classroom instruction of her courses in literature of the new demands for campus freedom — that were distasteful and the cause[8] of the rejection of a "continuing contract".
 
 
 6
 Under the spirit of the Conley[9] reading of a complaint which diminishes, if not altogether obliterates, the restrictive approach of some of our earlier cases[10] requiring the allegation of "facts" as distinguished from "conclusions" in civil rights cases,[11] this complaint is a direct, positive charge that these two teachers, who would otherwise have attained the coveted tenure, were denied the fourth year "continuing contract" solely because of their activities in supporting by word, deed, action and association ideas and lawful movements that were opposed by the State school authorities. That reduces the case to simple but awesome terms: apart from difficulties or deficiency in proof[12] — in light of the discretion that is essential for school officials to have in teacher selection — may the State constitutionally deny a state-created status because of First Amendment activities of the applicant?
 
 
 7
 Of course, the stock reflex to this question — there is no "right" to public employment, and here no "right" to a merit-based "continuing contract" — has for over a decade been rejected time and time again. "To state that a person does not have a constitutional right to government employment is only to say that he must comply with reasonable, lawful, and nondiscriminatory terms laid down by the proper authorities. * *" Slochower v. Board of Higher Education, 1956, 350 U.S. 551, 555, 76 S.Ct. 637, 639, 100 L.Ed. 692, 698. To draw from the fact that "persons seeking employment in" public schools have "no right to work for the State in the school system on their own terms" and such employment may be "upon * * * reasonable terms laid down by the * * * authorities" the "facile generalization that there is no constitutionally protected right to public employment is to obscure the issue. * * * We need not pause to consider whether an abstract right to public employment exists. It is sufficient to say that constitutional protection does extend to the public servant whose exclusion pursuant to a statute is patently arbitrary or discriminatory." Wieman v. Updegraff, 1952, 344 U.S. 183, 191, 73 S.Ct. 215, 219, 97 L.Ed. 216. "[T]he Court of Appeals for the Second Circuit correctly said in an earlier stage of this case, `* * * the theory that public employment which may be denied altogether may be subjected to any conditions, regardless of how unreasonable, has been uniformly rejected.'" Keyishian v. Board of Regents, 1967, 385 U.S. 589, 605-606, 87 S.Ct. 675, 685, 17 L.Ed.2d 629, 642. And to these pronouncements prior to the Trial Court's dismissal below must be added the Pickering[13] reiteration, just then fresh off the juridical press. "To the extent that the Illinois Supreme Court's opinion may be read to suggest that teachers may constitutionally be compelled to relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest in connection with the operation of the public schools in which they work, it proceeds on a premise that has been unequivocally rejected in numerous prior decisions of this Court. E. g., Wieman v. Updegraff, 344 U.S. 183 [73 S.Ct. 215, 97 L.Ed. 216] (1952); Shelton v. Tucker, 364 U.S. 479 [81 S.Ct. 247, 5 L.Ed.2d 231] (1960); Keyishian v. Board of Regents, 385 U.S. 589 [87 S.Ct. 675, 17 L.Ed.2d 629] (1967). `[T]he theory that public employment which may be denied altogether may be subjected to any conditions, regardless of how unreasonable, has been uniformly rejected.' Keyishian v. Board of Regents, supra, at 605-606 [87 S.Ct., at 685, 17 L.Ed.2d at 642]."
 
 
 8
 The protections of the First Amendment have been given special meaning when teachers have been involved.[14] Simply because teachers are on the public payroll does not make them second-class citizens in regard to their constitutional rights. See Spevack v. Klein, 1967, 385 U.S. 511, 87 S.Ct. 625, 17 L.Ed.2d 574; Garrity v. New Jersey, 1967, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562. "Our Nation is deeply committed to safeguarding academic freedom * * *." Keyishian v. Board of Regents, 1967, 385 U.S. 589, 603, 87 S.Ct. 675, 683, 17 L.Ed.2d 629, 640. "To impose any strait-jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation." Id. at 603, 87 S.Ct. at 684, 17 L.Ed.2d at 641. "`The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools.' Shelton v. Tucker, 364 U.S. 479, 487 [81 S.Ct. 247, 251, 5 L.Ed.2d 231, 236]. The classroom is peculiarly the `marketplace of ideas.' The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth `out of a multitude of tongues, [rather] than through any kind of authoritative selection.' * * *"[15] Id. at 603, 87 S.Ct. at 683, 17 L.Ed.2d at 641.
 
 
 9
 Nor does the further implied argument fare any better. In effect the school authorities assert that the teachers were not deprived of their rights, for neither was prevented from speaking, writing, and believing as he chose. If they wished to propagandize, simply do it elsewhere, not as public school teachers. But as Judge Learned Hand said years ago in Bomar v. Keyes, 2 Cir., 1947, 162 F.2d 136, 139. "It would emasculate the [Civil Rights] act * * * to leave without recourse those who were later made the victims of reprisals of which they had not been warned." More than that it would sap the Constitution of its vital force in relation to public employees. It would, in the area of First Amendment rights, be to throw out this Hobson's choice: speak or work. Moreover, the execution of any such policy through discharge or non-reemployment would have both a specific and a general impact. It would, as to the individual concerned, be to cut him off from work and income. But to others the consequence might well be more serious. It would be the warning that others would suffer the same fate so that eventually there would be workers, but not speaking or feeling free to speak, they would be silent workers. And in the teaching community we must recall that "`[t]he threat of sanctions may deter * * * almost as potently as the actual application of sanctions.' N.A.A.C.P. v. Button [1963, 371 U.S. 415, 433, 83 S.Ct. 328, 338, 9 L.Ed.2d. 405, 418] * * * The danger of that chilling effect upon the exercise of vital First Amendment rights must be guarded against by sensitive tools which clearly inform teachers what is being prescribed." Keyishian v. Board of Regents, supra, 385 U.S. 604, 87 S.Ct. at 684, 17 L.Ed.2d at 641.
 
 
 10
 Equally unpersuasive is the related argument that since there is no constitutional right to public employment, school officials only allowed these teachers' contracts to expire, and thus they cannot be liable for a violation of any rights protected by § 1983. But in the posture of this case this misconceives the whole thrust of their claim. The right sought to be vindicated is not a contractual one, nor could it be since no right to reemployment existed. What is at stake is the vindication of constitutional rights — the right not to be punished by the State or to suffer retaliation at its hand because a public employee persists in the exercise of First Amendment rights.
 
 
 11
 Yet in the face of the strong allegations which must now be credited (see notes 7, 8 supra), this bold position, accepted by the Trial Court, claims the very power purposely to retaliate and discriminate as a punitive, coercive depressant so long as no contractual (or appropriate local statutory) right to employment is violated. But the State may not deny the Constitution, and the Civil Rights Act by its terms makes the state-actor "liable * * * in an action at law" to the victim for the deprivation of any rights * * * secured by the Constitution * * *."
 
 
 12
 These principles were long ago followed in Bomar v. Keyes, supra — a case very closely in point with the one we face. There the plaintiff was dismissed from her teaching job because she took a month off to serve on a federal jury. She sued under the predecessor of § 1983 for loss of the expectancy of continued employment, an interest which the law will protect. The Court held that plaintiff had stated a claim for relief since she had a right to serve on a jury and the loss of her job had caused pecuniary damage.
 
 
 13
 Likewise unavailing is any effort to distinguish Bomar on the basis that in that case the teacher's contract was prematurely terminated, while in the present case defendants merely allowed plaintiffs' contracts to expire by their own terms. This again is to dilute the right from a constitutional to a contractual one.[16] Although this analysis extinguishes the principal contentions of the school authorities, as near as we can discern them,[17] we must yet answer the broad question stated above (see text at note 12, supra) — whether state-created status may be denied because of First Amendment activities. And the answer has to be: maybe yes, maybe no.
 
 
 14
 As Pickering and Tinker, supra, reflect, there are limitations on speech both for teachers and students. Thus, in Pickering the Court remarked "it cannot be gainsaid that the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general. The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Pickering v. Board of Education, 1968, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811, 817.
 
 
 15
 In this balancing only the broadest lines were indicated.[18] But the specifics mentioned by the Court identify factors which are relevant negatively, affirmatively, or both. "The statements [of the teacher] are in no way directed towards any person with whom appellant would normally be in contact in the course of his daily work as a teacher. Thus no question of maintaining either discipline by immediate superiors or harmony among coworkers is presented here. Appellant's employment relationships with the Board and, to a somewhat lesser extent, with the superintendent are not the kind of close working relationships for which it can persuasively be claimed that personal loyalty and confidence are necessary to their proper functioning." Id. at 391 U.S. 569-570, 88 S.Ct. 1735, 20 L.Ed.2d 818. An accusation that too much money is being spent on some activity is not necessarily per se detrimental to the school's interests for such "an accusation reflects rather a difference of opinion between Pickering and the Board as to the preferable manner of operating the school system, a difference of opinion that clearly concerns an issue of general public interest." Id. at 391 U.S. 571, 88 S.Ct. 1736, 20 L.Ed.2d 819. Nor was the Court "* * * presented with a situation in which a teacher has carelessly made false statements about matters so closely related to the day-to-day operations of the schools that any harmful impact on the public would be difficult to counter because of the teacher's presumed greater access to the real facts." Id. Rather, the Court went on, what was before it "is a case in which a teacher has made erroneous public statements upon issues then currently the subject of public attention, which are critical of his ultimate employer but which are neither shown nor can be presumed to have in any way either impeded the teacher's proper performance of his daily duties in the classroom or to have interfered with the regular operation of the schools generally." Id.
 
 
 16
 Against a sweeping declaration of First Amendment rights to students and teachers[19] the Court acknowledges that it "has repeatedly emphasized the need for affirming the comprehensive authority of the States and of school authorities, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools" so that "problem lies in the area where students in the exercise of First Amendment rights collide with the rules of the school authorities." Tinker, supra at 393 U.S. 507, 89 S.Ct. 737, 21 L.Ed.2d 738. "There is no indication that the work of the school or any class was disrupted. * * * [T]here were no threats or acts of violence on school premises." In "our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." Id. at 393 U.S. 508, 89 S.Ct. 737, 21 L.Ed.2d 738-739. Taking its cue from our decision in Burnside v. Byars, 5 Cir., 1966, 363 F.2d 744 and the obverse result in Blackwell v. Issaquena County Board of Education, 5 Cir., 1966, 363 F.2d 749, the Court summed up the State's burden.
 
 
 17
 "In order for the State in the person of school officials to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint. Certainly where there is no finding and no showing that the exercise of the forbidden right would `materially and substantially interfere with the requirements of appropriate discipline in the operation of the school,' the prohibition cannot be sustained. Burnside v. Byars, supra at 749." Tinker, supra at 393 U.S. 509, 89 S.Ct. 738, 21 L.Ed.2d 739.
 
 
 18
 "In the absence of a specific showing of constitutionally valid reasons to regulate their speech, students are entitled to freedom of expression of their views. As Judge Gewin, speaking for the Fifth Circuit, said, school officials cannot suppress `expressions of feelings with which they do not wish to contend.' Burnside v. Byars, supra, at 749." Id. at 393 U.S. 511, 89 S.Ct. 739, 21 L.Ed.2d 740.
 
 
 19
 But the Court makes plain that there must be this balancing. "But conduct by the student, in class or out of it, which for any reason — whether it stems from time, place, or type of behavior — materially disrupts classwork or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guaranty of freedom of speech. Cf. Blackwell v. Issaquena County Bd. of Education, 363 F.2d 749 (C.A. 5th Cir., 1966)." Id. at 393 U.S. 513, 89 S.Ct. 740, 21 L.Ed.2d 741. And the activities as protected or non-protected First Amendment rights depend on that weighing.[20]
 
 
 20
 We have emphasized these limitations because they demonstrate why an ascertainment of the real facts — not just what the lawyers say the facts are or amount to — is indispensable in marking the contours of rights so vital, both to the individual and to society in its policy determination of an educated, which is a responsible, citizenry. Without even intimating the acceptable outcome on remand, the two activities for which this claimed discrimination was meted out are quite different. One, relating to the effort to organize teachers for effective action is quite removed from the classroom-schoolhouse variety. The other, involving possible propaganda or agitation within the classroom and the course of instruction, comes much closer to collision with the need for discipline, both within the classroom and within the school as a whole. This may well limit the extent or kind of expression of ideas under the First Amendment's umbrella. This critical differentiation of precise facts will cut across both the merits of the claims and the remedy. For on the facts must rest the determination of whether the denial of a continuing contract was (a) a reprisal for these actions in expression of ideas, thoughts or associations rather than permissible nondiscriminatory professional evaluations and, if so, (b) whether under the circumstances in relation to the reasonable demands of a system of organized responsible learning these actions were protected. On a finding of (a) and (b) the remedy (c) might well also depend on all of the facts. See, Tinker, supra, at 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed. 2d 742.
 
 
 21
 So now months later the case goes back to find how much of a case it is for either one or both of these teachers. Whether it gets any place, or how far it will go is beyond prediction now except — as we repeat and repeat and as done so recently in Webb v. Standard Oil Co., 5 Cir., 1969, 414 F.2d 320; and Equity Capital Co. v. Sponder, 5 Cir., 1969, 414 F.2d 317, ___ as the case is recommitted to the superintendence of the Trial Judge without the slightest possible whisper of a suggestion as to how it will or should come out.
 
 
 22
 Reversed and remanded.
 
 
 
 Notes:
 
 
 [1]
 The precariousness of dismissals on barebone pleadings was documented in Millet v. Godchaux Sugars, Inc., 5 Cir., 1957, 241 F.2d 264, n. 1 and Barber v. M/V "Blue Cat", 5 Cir., 1967, 372 F.2d 626, n. 1, 1967 A.M.C.1926. The following cases should be added to those lists:
 Equity Capital Co. v. Sponder, 5 Cir., 1969, 414 F.2d 317 [S.D.Fla.]; Firestone v. Time, Inc., 5 Cir., 1969, 414 F.2d 790 [S.D.Fla.]; Stern, Hays & Lang, Inc. v. M/V Nili, 5 Cir., 1969, 407 F.2d 549 [S.D.Fla.]; Banco Continental v. Curtiss National Bank, 5 Cir., 1969, 406 F.2d 510 [S.D.Fla.]; Stanley v. Wainwright, 5 Cir., 1969, 406 F.2d 8 [M.D.Fla.]; Mizell v. North Broward Hospital Dist., 5 Cir., 1968, 392 F.2d 580, 581 [S.D.Fla.]; Molnar v. Gulfcoast Transit Co., 5 Cir., 1967, 371 F. 2d 639, 1968 A.M.C. 726 [M.D.Fla.];
 Webb v. Standard Oil Co., 5 Cir., 1969, 414 F.2d 320 [M.D.Ga.]; Barnes v. Merritt, 5 Cir., 1967, 376 F.2d 8 [M. D.Ga.]; Tyler v. Peel Corp., 5 Cir., 1967, 371 F.2d 788 [S.D.Ga.];
 Dailey v. Quality School Plan, Inc., 5 Cir., 1967, 380 F.2d 484 [N.D.Tex.]; Fletcher v. Hightower, 5 Cir., 1967, 381 F.2d 371 [N.D.Tex.];
 Robertson v. Johnston, 5 Cir., 1967, 376 F.2d 43 [E.D.La.]; United States v. Mike Bradford and Co., Inc., 5 Cir., 1967, 375 F.2d 765 [W.D.La.].
 
 
 [2]
 The formal judgment for the defendants simply stated:
 "1. The Motion to Dismiss be, and the same is, hereby granted. The Court has indicated that it would allow an amended complaint to be filed, but counsel for the Plaintiffs has elected to stand on the original complaint."
 Which one or more or all of the following eleven grounds for the motion induced the order is unknown:
 "1. The complaint fails to state a cause of action upon which relief can be granted.
 
 
 [2]
 The complaint fails to state a cause of action within the jurisdiction of this Court
 
 
 [3]
 The complaint fails to allege violation of the plaintiffs' civil rights under 28 U.S.C. Section 1343 and 42 U.S.C. Sections 1981-1985, since the complaint does not allege a grievance arising from the exercise of state law but alleges an action based upon a violation of state law
 
 
 [4]
 Plaintiffs complain of discretionary action on the part of the defendants which is subject neither to statute nor to Court supervision
 
 
 [5]
 The complaint fails to state which laws of the state or federal government and which provisions of the Florida Constitution or United States Constitution prohibit the defendants from acting in the manner set forth in the complaint
 
 
 [6]
 The complaint fails to demonstrate that the plaintiffs have met all of the requirements for a continuing contract since it appears from the complaint that the plaintiffs did not obtain the approval of the president of Miami Dade Junior College for a continuing contract
 
 
 [7]
 The complaint fails to state wherein the defendants have acted contrary to law
 
 
 [8]
 The complaint fails to allege any violation by the defendants of any federal or Florida statute
 
 
 [9]
 The complaint fails to allege facts sufficient to invoke the alleged violation of the First Amendment guaranteeing free speech to the plaintiffs
 
 
 [10]
 The complaint fails to allege a controversy within the provisions of 28 U.S.C. Section 2201
 
 
 [11]
 The complaint seeks to compel the defendants to act in a certain manner contrary to the inherent discretionary authority given to the defendant by state law."
 
 
 [3]
 The defendants were described in the complaint:
 "3. Defendant, BOARD OF PUBLIC INSTRUCTION OF DADE COUNTY, FLORIDA, is a body corporate, among whose purposes and functions is to operate the schools and establish the personnel policies therefor in Dade County, Florida. The Defendant, DR. PETER MASIKO, JR., is the chief administrator of the school involved in this controversy, Miami-Dade Junior College, and the Defendants, AMBROSE GARNER and DR. JOHN L. FORBES, are his two assistants at the divisions of this school known as the North Campus and the South Campus, respectively."
 
 
 [4]
 There are four statutory requirements:
 "1. Holds a regular certificate based at least on graduation from a standard four (4) year college, or as otherwise provided by law;
 
 
 [2]
 Has completed three (3) years of service in the same county of the state during a period not in excess of five (5) successive years, such service being continuous except for leave duly authorized and granted, who
 
 
 [3]
 Has been reappointed for the fourth year; and
 
 
 [4]
 Has been recommended by the county superintendent for such continuing contract based on successful performance of duties and demonstration of professional competence * * *."
 Fla.Stat.Ann. § 231.36 (1969 Supp.).
 
 
 [5]
 Indeed, the complaint went way beyond the requirements. As to Mrs. Pred it attached the college's Professional Evaluation Form showing in detail her high marks. A similar form for Etersque was expanded in great detail by the four-page report of the Faculty Senate Appeals Committee recommending that in his appeal from the Administrator's adverse action a "continuing contract" be granted
 
 
 [6]
 Jurisdiction was based on 28 U.S.C.A. § 1343 and § 1331 and substantively on 42 U.S.C.A. §§ 1981-1985
 
 
 [7]
 "10. At all times pertinent hereto, the Plaintiffs have been members of and active in the programs of the Dade County Classroom Teachers' Association, Inc., an organization of teachers whose function is to protect the interests of teachers in Dade County and to encourage and protect academic freedom. The Plaintiffs have expressed sympathy with the objects of the Dade County Classroom Teachers' Association, Inc., and have expressed their concern for educational betterment and improvement. The Plaintiff, STANLEY ETERSQUE, has been a vital and moving force in the recruitment of members for the Dade County Classroom Teachers' Association at the South Campus of the subject school. These actions have offended those Defendants who are administrative officers simply because they are opposed to the purposes of the Dade County Classroom Teachers' Association, Inc., and wish to rid their schools of those who do not agree with their own philosophy
 
 
 [11]
 The Plaintiff, ELENORE PRED, has apparently been committed to a course of conduct that encourages students to participate in `the current demand for campus freedoms.' She has had the audacity to discuss these subjects in conjunction with a course on literature and has even mentioned `arbitrary use of authority by College Administration.' These actions by the Plaintiff, ELENORE PRED, have offended the individual administrators who are her superiors, as evidenced by a report to Dr. Ann Ackourney from Mr. George Bergen (her immediate superior) as set forth in a memorandum dated March 30, 1968, a true copy of which is attached hereto and made a part hereof."
 
 
 [8]
 "8. The Defendants have so acted solely for the purpose of destroying the Plaintiffs' rights of freedom of speech and assembly and for the purpose of curtailing and restricting academic freedom. The Defendants have used their power to hire and rehire in a manner so as to chill and depress freedom of speech and academic freedom among their instructional personnel. The individual defendants have embarked upon a program of repression of liberty and academic freedom in the schools under their control that has almost no parallel or precedent within the United States with the possible exception of the dark days when school administrations were discharging or refusing to rehire teachers who engaged in civil rights activities. The individual defendants intend to use the non-rehiring of the Plaintiffs as an example of what will happen to those under their supervision and control who do not adhere to the `administration line' in the expression of their views, both on and off the campus
 
 
 [12]
 All of the foregoing expressions on the part of the plaintiffs are anathema to the individual Defendants. It was for these expressions of views and solely for these expressions of views and not for any demonstrated incompetencies as teachers, that the Defendants have refused to rehire the Plaintiffs for the forthcoming school year. It is for these expressions of views and not for any other reasons that the Plaintiffs are now being penalized
 
 
 [14]
 The actions of the Defendants are in violation of the laws and Constitutions of the State of Florida and of the United States which prohibits [sic] governmental bodies and personnel from acting in wholly arbitrary, whimsical and capricious fashion; from acting to destroy academic freedom, assembly and expression. At all times pertinent hereto, the Defendants have been acting under color of law pursuant to an authority purportedly vested in them by the Government and laws of the State of Florida."
 
 
 [9]
 Conley v. Gibson, 1957, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80. See also cases cited at note 1,supra.
 
 
 [10]
 See, e. g., McGuire v. Todd, 5 Cir., 1952, 198 F.2d 60, cert. denied, 344 U.S. 835, 73 S.Ct. 44, 97 L.Ed. 649; Tucker v. National Linen Service, 5 Cir., 1953, 200 F.2d 858, cert. denied, 346 U.S. 817, 74 S.Ct. 28, 98 L.Ed.2d 343
 
 
 [11]
 This reading wipes out the equally fallacious notion asserted by some cases that allegations of "conspiracy", or the like, to violate civil rights, such as under 42 U.S.C.A. § 1985, must have the specificity of charges of fraud under F.R. Civ.P. 8(a)
 
 
 [12]
 This seems to be the real basis for the Eighth Circuit's decision in Freeman v. Gould Special School District, 8 Cir., 1969, 405 F.2d 1153, and the point of departure between the majority and the dissent. From what we hold in the instant case, it is evident that we approve of much of Judge Lay's strong dissent
 
 
 [13]
 Pickering v. Board of Education, 1968, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811, 817 [decided June 3, 1968.] The dismissal of the same date (note 2,supra) was entered on June 7, 1968, F.R.Civ.P. 58.
 
 
 [14]
 Keyishian v. Board of Regents, 1967, 385 U.S. 589, 603, 87 S.Ct. 675, 17 L.Ed. 2d 629, 640-641Cf. Beilan v. Board of Education, 1958, 357 U.S. 399, 78 S.Ct. 1317, 2 L.Ed.2d 1414.
 
 
 [15]
 Quoted with approval in Tinker v. Des Moines Community School Dist., 1969, 393 U.S. 503, 512, 89 S.Ct. 733, 739, 21 L.Ed.2d 731, 741
 
 
 [16]
 See also from the Fourth Circuit, Johnson v. Branch, 4 Cir., 1966, 364 F.2d 177, cert. denied, 1967, 385 U.S. 1003, 87 S. Ct. 706, 17 L.Ed.2d 542, rev'ing, E.D.N.C., 1965, 242 F.Supp. 721, in which the plaintiff, a Negro school teacher, alleged racial discrimination — a constitutionally protected area under section 1983 — by the school board in allowing her contract to expire after a white school and a Negro school were consolidated. The school board advanced two theories to support its motion to dismiss: plaintiff's contract had expired and she had no constitutional right to public employment, and plaintiff had furnished defendant with good cause for dismissal. As to the first defense the Court said that "no one questions the fact that the plaintiff had neither a contract nor a constitutional right to have her contractrenewed, but these questions are not involved in this case." 364 F.2d at 179 (Emphasis added). As to the second defense, the Court said that "we take it to be beyond cavil that the state may not force the plaintiff to choose between exercising her legitimate constitutional rights and her right of equality of opportunity to hold public employment." 364 F.2d at 180. Cf. Garrity v. New Jersey, 1967, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562, 567.
 
 
 [17]
 Two further arguments can be quickly disposed of. One, the absence of the county superintendent as a party, if really the ultimate hiring authority (See F.S.A. § 231.36, note 4,supra), as distinguished from the President of a college as here, is not fatal at this stage where his professional judgment is being influenced by staff recommendations assumed to be the product of constitutional discrimination. The second is that an English teacher (Mrs. Pred) cannot teach notions of "freedom" etc. in literature courses. Although classroom activities involve a closer confrontation between complete freedom of expression and essential discipline, which is a proper factor for close evaluation, it would obliterate cherished ideas about the relationship of teacher-pupil and the teacher's role in character building were instruction so closely confined to the technicalities of a particular subject or academic discipline. With its inexorable logic and predictability there may even be a great moral lesson in 2 × 2 equal 4.
 
 
 [18]
 "Because of the enormous variety of fact situations in which critical statements by teachers and other public employees may be thought by their superiors, against whom the statements are directed, to furnish grounds for dismissal, we do not deem it either appropriate or feasible to attempt to lay down a general standard against which all such statements may be judged."Pickering, supra at 391 U.S. 569, 88 S.Ct. 1735, 20 L.Ed. 2d 817.
 
 
 [19]
 "First Amendment rights, applied in light of the special characteristics of the school environment, are available to teachers and students. It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate. This has been the unmistakable holding of this Court for almost 50 years."
 Tinker, supra at 393 U.S. 506, 89 S.Ct. 736, 21 L.Ed.2d 737.
 
 
 [20]
 The opinion concluded:
 "As we have discussed, the record does not demonstrate any facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities, and no disturbances or disorders on the school premises in fact occurred. These petitioners merely went about their ordained rounds in school. Their deviation consisted only in wearing on their sleeves a band of black cloth, not more than two inches wide. They wore it to exhibit their disapproval of the Vietnam hostilities and their advocacy of a truce, to make their views known, and by their example, to influence others to adopt them. They neither interrupted school activities nor sought to intrude in the school affairs or the lives of others. They caused discussion outside of the classrooms, but no interference with work and no disorder. In the circumstances, our Constitution does not permit officials of the State to deny their form of expression."
 Tinker, supra at 393 U.S. 514, 89 S.Ct. 741, 21 L.Ed.2d 741.