# BRUKIEWA *v.* POLICE COMMISSIONER OF BALTIMORE CITY

[No. 149, September Term, 1969.]

*Decided February 13, 1970.*

The cause was argued before HAMMOND, C. J., and BARNES, McWILLIAMS, SINGLEY, SMITH and DIGGES, JJ.

*William H. Engelman,* with whom were *Berenholtz, Kaplan & Heyman* on the brief, for appellant.

*Bernard L. Silbert, Assistant Attorney General,* with whom was *Francis B. Burch, Attorney General,* on the brief, for appellee.

HAMMOND, C. J., delivered the opinion of the Court. BARNES, J., dissents. Dissenting opinion at page 59 *infra.*

We are called upon in this appeal to decide whether the State impermissibly restricted the constitutional right a policeman has freely to speak his mind.

The appellant Brukiewa has been a member of the Baltimore City Police Department for over thirteen years and has been officially commended for his police services nine times. He is president of the Baltimore City Police Department, Local Union 1195, American Federation of State, County and Municipal Employees (AFL-CIO). In 1967 and 1968 the Union was endeavoring, apparently unsuccessfully, to have its voice heard and heeded by the Police Commissioner.

Brukiewa and a fellow policeman, Gary Woodcock, were invited to and did appear on a television program on WJZ (Channel 13), Baltimore, on June 19, 1968. The transcript of the program shows that the following was communicated to those in the Baltimore area watching and listening to Channel 13:

"George Baumann

Two and a half years ago the Baltimore Police Department was carefully scrutinized by the International Association of Chiefs of Police and the result of that study [was that] the department was revamped from top to bottom. Almost every phase of police work and policy was altered to meet contemporary needs.

Police Commissioner Donald Pomerleau was a consultant for the I.A.C.P. and since taking over the department has energetically tried to effect the I.A.C.P. recommendations. But that restructuring of the department has caused concern in the ranks of the City Police, according to Investigative Reporter Christopher Gaul:

Christopher Gaul

That concern is being aggressively voiced by the Police Union, which is estimated 1700 members, represent about half of the total force. The Union has just put out a 14 page position paper which charges that the recommendations contained in the I.A.C.P. report are a criminal waste of money and that those recommendations endanger the lives of police officers. According to policemen who wrote the position paper, the I.A.C.P. report was geared to small western towns, not to large old urban areas like Baltimore. The paper attacks everything from the changes of uniforms to the way Commissioner Pomerleau handled Baltimore's April riot. I talked to two of the Union Officials, both working policemen. The President is Eugene

Brukiewa, a thirteen and a half year veteran. Officer Gary Woodstock [sic] a nine year veteran and a K-9 Patrolman helped prepare the position paper. He began by discussing new I.A.C.P. suggestive reporting technique.

Officer Gary Woodcock

In the old days we did hold a few reports, here and there, smaller crimes weren't reported, but in 64 the Sunpapers, they had a very critical article about the Police Administration at that time and ever since then we've been keeping pretty accurate reports.

Christopher Gaul

Do you think Commissioner Pomerleau is a competent, effective Administrator?

Officer Gary Woodcock

Ah.... . . .. ........... No.

Christopher Gaul

Officer Brukiewa, your position paper is a harsh indictment of the City Police Administration, do you think the Union should be in a position of criticizing actual police policy?

Officer Brukiewa

Well, we feel that it's gotten to a point where definitely we have to start criticizing police policy, due to the fact we have tried to get together with Commissioner Pomerleau to explain problems that still exist with Patrolmen, the reporting system, other issues, to try to help him to make us a good department, but Mr. Pomerleau just has a mind of his own, he sticks strictly to the I.A.C.P. report and we feel definitely that this is nothing to this City.

Christopher Gaul

How would you describe the morale of the Department?

Officer Brukiewa

Right now, I'd say it's hit its lowest ebb, right now.

Christopher Gaul

Would you attribute that to the recommendations of the I.A.C.P. report?

Officer Brukiewa

I'd say definitely, I've been here a good while and I've tried to——, I've looked into this system, I've looked into it well and the men feel right now that they are completely lost from the public. Years ago when we worked the foot posts, you could get out and talk to people, you got information, now, when you work in a car, you go driving right on by, they wave to you to stop. You are scared to get out of the car because if you don't answer when they call you, you have to make a slip up because they hit you with a delinquency slip. You only have a half an hour out of an hour for foot patrol and with this you can't possibly get around through the post you are working.

Christopher Gaul

What do you think will happen to the City Police Department, say within the next six months, if what you say is happening and continues to happen?

Officer Brukiewa

I really hate to predict it, but I feel that the bottom is going to fall out of this City.

Christopher Gaul

The Police Commissioner has refused to respond to the Police Union's criticism, but I'll take a look at the Administration's attitude tomorrow anyway. This is Christopher Gaul."

As a result of the broadcast Officer Brukiewa was charged with a violation of the Rules and Regulations of the Police Department of Baltimore City for conduct "unbecoming a member of the Baltimore Police Department, and prejudicial to or tending to undermine good order, efficiency, or discipline of the Department," and

two specifications thereunder alleging violations of Sections 12 and 16 of Rule 1.

Officer Woodcock was also charged with a violation of Rule 1, and one specification thereunder alleging a violation of Section 12.

Rule 1 of the Rules and Regulations of the Police Department reads as follows:

> "Any breach of the peace, neglect of duty, misconduct or any conduct on the part of any member of the Department either within or without the City of Baltimore, which tends to undermine the good order, efficiency, or discipline of the Department, or which reflects discredit upon the Department or any member thereof, or which is prejudicial to the efficiency and discipline of the Department, even though these offenses may not be specifically enumerated or laid down, shall be considered conduct unbecoming a member of the Police Department of Baltimore City, and subject to disciplinary action by the Police Commissioner."

Section 12 is as follows:

> "No member of the Department shall publicly criticize or ridicule the official action of any member of the Department, public official, judge, or magistrate."

Section 16 is as follows:

> "All members of the Department shall treat as confidential the official communications and business of the Department."

A hearing was held before a police department disciplinary board on July 17, 1968. Each officer was found guilty as charged and ordered dismissed from the force, the dismissal to be suspended, with probation for six months, during which time the officer should be assigned

only to the night shift. The Commissioner approved the dismissals, changed the suspension to twelve months (making no references to night duty) with a proviso that at the end of a year "unless the suspension is sooner vacated, the sentence will be remitted without further action."

The basis of the charge against Woodcock apparently was his criticism of Commissioner Pomerleau in answering "no," to the interviewer's question, "Do you think that Commissioner Pomerleau is a competent, effective administrator?"

The basis of the charge against Brukiewa apparently was his public criticism of the Department in saying that the reporting system and patrol procedure are problems, and that the Department's morale has "hit its lowest ebb," and that in response to the question of what will happen to the City Police Department within the next six months if the situation continues, "I feel the bottom is going to fall out of this City."

The disciplinary board announced no findings of fact and no conclusions as to the effects and results, if any, of the statements found by it to have been offensive to Rule 1. Woodcock and Brukiewa appealed to the Baltimore City Court under the Administrative Procedure Act, Code (1965 Repl. Vol.), Art. 41, §§ 244-256. Judge Sodaro heard and decided the case on the charges, the orders of punishment, the television transcript and his remembrance of the riots and disorders that swept Baltimore in April of 1968. It seems now to be conceded, tacitly at least, and we think properly so, that there is no merit in the vague and unsupported charge that Brukiewa failed to keep confidential police business, and we shall give it no further consideration.

Judge Sodaro dismissed the appeals, finding (1) that the rules of the police department were reasonable, unambiguous and constitutional; (2) that in light of the April riots which had caused "vitriolic attacks" on the Department by a minority of Baltimoreans who were "angry people who had suffered losses * * * and those

who would have used greater force in dealing with the trouble," the Department "as never before \* \* \* urgently need cohesion in its ranks and a rebirth of respect and confidence within the community;" (3) that:

> "It was in this explosive situation that the Appellants injected public statements that were given the widest circulation. Their utterances were corrosive of confidence in the Police Department and tended to widen the breach between the police and the public. The morale and discipline of the Department had to obviously suffer from the divisive effect of the statements. The Appellants then had a duty of loyalty to the Police Department, their employer, and a duty of temperate speech in consideration of the prevailing tense situation, as well as the obligation to comply with stated rules and regulations of the Department.
>
> "The evidence is clear that these Appellants were highly critical of and heaped censure upon the Police Commissioner and the Police Department in their interview on television;"

(4) that:

> "The Appellants' contention of a failure of proof that their statements amounted to conduct that tended to undermine the good order, efficiency or discipline of the Department or reflected discredit upon the Department is without merit. The Disciplinary Board that heard the evidence were superior officers of long tenure with substantial experience in the Police Department. The five members included the Chief of the Criminal Investigation Department with the rank of Lieutenant Colonel, an Assistant Chief of Patrol with the rank of Major, a Captain, a Lieutenant, and a Sergeant. They were eminently qualified by unique and

special knowledge gleaned from many years in the Department to pass judgment upon the effects of the Appellants' statements on the morale and discipline of the Department. Certainly, they were in a better position to do so than the court and counsel. Their expertise is entitled to great weight. It would be presumptuous for [me] to substitute [my] judgment and to hold that their findings and that of the Police Commissioner were not supported by substantial evidence;"

and finally, in answer to the arguments that Brukiewa had permissibly exercised the right of free speech, (5) by finding controlling, and quoting extensively from *Meehan v. Macy* (D.C. Cir.), 392 F. 2d 822, 833-834 (a case in which a police officer of the Canal Zone intemperately, contemptuously, defamatorily and with invective, lampooned the Governor of the Zone, and was dismissed), as follows:

" 'Free and open discussion within an agency of government is different from heated debate flowing into the public arena. While a free society values robust, vigorous and essentially uninhibited public speech by citizens, when such uninhibited public speech by government employees produces intolerable disharmony, inefficiency, dissension and even chaos, it may be subject to reasonable limitations, at least concerning matters relating to the duties, discretion, and judgment entrusted to the employee involved. There is a reasonable difference between the kind of discipline and limitation on speech the government may impose on its employees and the kind it may impose on the public at large. To ensure a basic efficiency in public service a limitation may be imposed as a condition of government employment that is broader than the standard that defines the wrongdoing

that subjects a private citizen to penalty or damage action.

\* \* \*

" 'The fact that Meehan was also the spokesman for the police union may have increased his authority to speak in behalf of his union members when he confined his speech to appropriate channels. It also gave him a stature and commensurate responsibility, both to the union and to the employer, to confine himself to channels and to exercise temperance.' "

Both Brukiewa and Woodcock appealed Judge Sodaro's ruling. Without giving any reason for doing so, Woodcock dismissed his appeal a few days before argument of the case in this Court, and we deal only with Brukiewa's case.

Judge Oliver Wendell Holmes, speaking for the Supreme Judicial Court of Massachusetts, said in 1892,[1] somewhat epigrammatically: "[McAuliffe] may have a constitutional right to talk politics, but he has no constitutional right to be a policeman." Mr. Justice Holmes later observed that:[2] "It is one of the misfortunes of the law that ideas become encysted in phrases and thereafter for a long time cease to provoke further analysis." The latter observation proved substantially true for many years as to the epigrammatic phrase in *McAuliffe*. Professor Van Alstyne notes in his article, *The Demise of the Right-Privilege Distinction in Constitutional Law*, 81 Harv. L. Rev. 1439, 1441 n. 7, that *McAuliffe* had fathered more than 70 cases of which almost four-fifths resolved the decision against the constitutional right being asserted.[3] He also notes that beginning some years

1. McAuliffe v. City of New Bedford, 155 Mass. 216, 29 N. E. 517.
2. Hyde v. United States, 225 U. S. 347, 391, 56 L. Ed. 1114, 1135, Holmes, J., dissenting.
3. This Court has itself, in situations other than that presented by the instant case, quoted the Holmes epigram. See Hammond v. Lancaster, 194 Md. 462, 483 (concurring opinion of Marbury, C.J.); Rogan v. Cook, 188 Md. 345, 352.

46

after the decision in *McAuliffe* courts began to question the validity of the right-privilege distinction and to "erode the [Holmes] epigram" by circumventing in various ways "the harsh consequences of the right-privilege distinction as applied to private interests in the public sector." *Id.* at 1445. Nevertheless, in some quarters the erosion was slow for as late as 1952 the Supreme Court, in *Adler v. Board of Education,* 342 U. S. 485, 492, 96 L. Ed. 517, 524, held constitutional a New York statute providing that one who teaches or advocates or knowingly is a member of an organization which teaches or advocates the overthrow of the government by force or violence, should be disqualified from employment in the public school system, saying through Mr. Justice Minton in another way what Judge Holmes had said in *McAuliffe* sixty years earlier:

> "It is clear that [State employees] have the right under our law to assemble, speak, think and believe as they will * * *. It is equally clear that they have no right to work for the State in the school system on their own terms * * *. They may work for the school system upon the reasonable terms laid down by the proper authorities of New York. If they do not choose to work on such terms, they are at liberty to retain their beliefs and associations and go elsewhere."

The composition of the Court and prevailing constitutional philosophy had changed as the decade of the 1960s began. Coming events cast their shadow before them when the Court, in *Sherbert v. Verner,* 374 U. S. 398, 404, 10 L.Ed.2d 965, 971, held that unemployment compensation could not be denied a Seventh-Day Adventist who was discharged by her employer because she refused to work on Saturday, the Sabbath Day of her faith, because to so penalize her would impair the free exercise of her religion, there not being present a compelling

State interest in a subject within its constitutional power to regulate. The Court said:

> "Nor may the South Carolina court's construction of the statute be saved from constitutional infirmity on the ground that the unemployment compensation benefits are not appellant's 'right' but merely a 'privilege.' It is too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or the placing of conditions upon a benefit or privilege."

Any belief in the validity of the Holmes epigram or the Minton restatement in *Adler* was dispelled by *Keyishian v. Board of Regents,* 385 U. S. 589, 605, 17 L.Ed.2d 629, 642, in which the Court declared unconstitutional the very statute upheld in *Adler.* Mr. Justice Brennan said for the Court:

> "But constitutional doctrine which has emerged since [the *Adler*] decision has rejected its major premise. That premise was that public employment * * * may be conditioned upon the surrender of constitutional rights which could not be abridged by direct government action."

Finally, in *Pickering v. Board of Education,* 391 U. S. 563, 20 L.Ed.2d 811, the Supreme Court put together all that had gone before. See Note, *The First Amendment and Public Employees:* Times *Marches On,* 57 Georgetown L. J. 134. There the Court invalidated the dismissal of a public school teacher who had written a letter to a newspaper criticizing acts and omissions of the Board of Education and the Superintendent. The Supreme Court of Illinois,[4] in considering the claim that freedom of speech had been shackled, opined that *New York Times Co. v. Sullivan,* 376 U. S. 254, 11 L.Ed.2d 686, which held that untrue accusations against public officials are ac-

4. Pickering v. Board of Education, 225 N.E.2d 1, 6. Justice Schaeffer and Chief Justice Solfisburg dissented.

tionable only if actual malice is shown, had no application. It saw the controlling issue to be "whether [the school board] must continue to employ one who publishes misleading statements which are reasonably believed to be detrimental to the schools." It said:

> "By choosing to teach in the public schools, plaintiff undertook the obligation to refrain from conduct which in the absence of such position he would have an undoubted right to engage in. While tenure provisions of the School Code protect teachers in their positions from political or arbitrary interference, they are not intended to preclude dismissal where the conduct is detrimental to the efficient operation and administration of the schools of the district."

Mr. Justice Marshall for the Supreme Court said (391 U. S. at 568, 20 L.Ed.2d at 817):

> "To the extent that the Illinois Supreme Court's opinion may be read to suggest that teachers may constitutionally be compelled to relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest in connection with the operation of the public schools in which they work, it proceeds on a premise that has been unequivocally rejected in numerous prior decisions of this Court."

The opinion went on to note that the School Board urged that (*Id.*):

> " 'the teacher by virtue of his public employment has a duty of loyalty to support his superiors in attaining the generally accepted goals of education and that, if he must speak out publicly, he should do so factually and accurately, commensurate with his education and experience,' "

and that the teacher argued for application to teachers of the *New York Times* rule that statements to be actionable must be made " 'with knowledge that [they were] false or with reckless disregard of whether [they were] false or not.' " The Court said (391 U. S. at 569, 20 L.Ed.2d at 817-818) :

> "Because of the enormous variety of fact situations in which critical statements by teachers and other public employees may be thought by their superiors, against whom the statements are directed, to furnish grounds for dismissal, we do not deem it either appropriate or feasible to attempt to lay down a general standard against which all such statements may be judged. However, in the course of evaluating the conflicting claims of First Amendment protection and the need for orderly school administration in the context of this case, we shall indicate some of the general lines along which an analysis of the controlling interests should run."

The general lines of analysis of the statements in Pickering's letter were that the statements were not directed to any person with whom he would be in daily contact in his work as a teacher so that there was created no problem of maintaining discipline by immediate superiors or of disharmony among co-workers; a teacher's employment relationships with a school board and a superintendent "are not the kind of close working relationships for which it can persuasively be claimed that personal loyalty and confidence are necessary to their proper functioning" (391 U. S. at 570, 20 L.Ed.2d at 818). The Court then said (*Id.*) :

> "Accordingly, to the extent that the Board's position here can be taken to suggest that even comments on matters of public concern that are substantially correct, * * * may furnish grounds for dismissal if they are sufficiently critical in tone, we unequivocally reject it."

The Court then took up the statements of Pickering that were false or inaccurate, saying (391 U. S. at 572-573, 20 L.Ed.2d at 819-820) :

"What we have before us is a case in which a teacher has made erroneous public statements upon issues then currently the subject of public attention, which are critical of his ultimate employer but which are *neither shown* nor *can be presumed* to have in any way either impeded the teacher's proper performance of his daily duties in the classroom or to have interfered with the regular operation of the schools generally. In these circumstances we conclude that the interest of the school administration in limiting teachers' opportunities to contribute to public debate is not significantly greater than its interest in limiting a similar contribution by any member of the general public." (Emphasis added.)

In discussing the impact of the *New York Times* rule on the matter before the Court, Mr. Justice Marshall noted that the public interest in having free and unhindered debate on matters of public importance is so great that in *New York Times* the Court had held that statements directed at a public official are actionable only if made with knowledge of their falsity or with reckless disregard for their truth or falsity. The Court said that therefore it was clear that had Pickering been a member of the general public the State's power to afford the Board any legal right to sue him would be limited by the *Times* rule. Also, said Mr. Justice Marshall (391 U. S. at 574-575, 20 L.Ed.2d 820-821) :

"This Court has also indicated, in more general terms, that statements by public officials on matters of public concern must be accorded First Amendment protection despite the fact that the statements are directed at their nomi-

nal superiors. *Garrison v. Louisiana,* 379 U. S. 64, 13 L.Ed.2d 125, 85 S. Ct. 209 (1964); *Wood v. Georgia,* 370 U. S. 375, 8 L.Ed.2d 569, 82 S. Ct. 1364 (1962). In *Garrison,* the *New York Times* test was specifically applied to a case involving a criminal defamation conviction stemming from statements made by a district attorney about the judges before whom he regularly appeared.

"* * * We have already noted our disinclination to make an across-the-board equation of dismissal from public employment for remarks critical of superiors with awarding damages in a libel suit by a public official for similar criticism. However, in a case such as the present one, in which the fact of employment is only tangentially and insubstantially involved in the subject matter of the public communication made by a teacher, we conclude that it is necessary to regard the teacher as the member of the general public he seeks to be.

"In sum, we hold that, in a case such as this, absent proof of false statements knowingly or recklessly made by him a teacher's exercise of his right to speak on issues of public importance may not furnish the basis for his dismissal from public employment. Since no such showing has been made in this case regarding appellant's letter, * * * his dismissal for writing it cannot be upheld and the judgment of the Illinois Supreme Court must, accordingly, be reversed * * *."

There can be no doubt that a policeman has full First Amendment rights. In *Garrity v. New Jersey,* 385 U. S. 493, 500, 17 L.Ed.2d 562, 567, the Supreme Court said: "We conclude that policemen, like teachers and lawyers, are not relegated to a watered-down version of constitutional rights"—adding that those rights may not be con-

ditioned by the State by the exaction of a price. "Assertion of a First Amendment right is still another [of those rights]." *Id. See also Wood v. Georgia,* 370 U. S. 375, 8 L.Ed.2d 569; *In re Gioglio* (Middlesex County Ct. N. J.), 248 A. 2d 570; and Note, *The First Amendment and Public Employees—An Emerging Constitutional Right to be a Policeman?,* 37 George Washington L. Rev. 409.

If the Supreme Court's opinion in *Pickering* is read with the word "policeman" substituted for teacher, and with full consideration being given to the differences between the operation of schools and the operations of a police department and the State's interest in a disciplined and efficient police department, we cannot escape the conclusion that the Supreme Court, were the case before us before it, would hold that Brukiewa did not go beyond the bounds of permissible free speech and that the State cannot discipline him for what he said. Accordingly, we so hold.

Nothing that Brukiewa said has been charged, shown or found to be false or even inaccurate, nor may it be presumed to be. His personal fitness to perform his daily police duties obviously was not impaired by what he said for the Commissioner kept him on his regular active duty. His statements were not directed towards a: superior with whom he would come into daily or frequent contact. His statements were not charged, shown or found to have affected discipline or harmony or the general efficiency or effectiveness of the police department. There is no basis in the record and no basis in permissible judicial notice for Judge Sodaro's statements that the utterances were in fact corrosive of confidence in the police department and tended to widen the breach between the police and the public, and that "the morale and discipline of the Department had to obviously suffer from the divisive effect of the statements." The burden is on the State to establish that public utterances make the utterer unfit for public service or adversely affect public services to a degree that justifies their restriction. As *Pickering* said, effects or conditions that permissibly in-

hibit or hamper the exercise of free speech are not to be presumed. Here, neither the police disciplinary board nor the Commissioner made any findings which would support the State's right to inhibit or hamper Brukiewa's right to speak freely on matters of public importance, particularly matters as to which he had experienced expertise. On what was before him Judge Sodaro could not belatedly purport to find what he thought the board and the Commissioner must or should have found.

The Courts have applied the *Pickering* tests and requirements in various areas and circumstances of public employment. In *Tinker v. Des Moines Community School District*, 393 U. S. 503, 509, 21 L.Ed.2d 731, 739, the Court held that the problem presented by public school children, during school hours, on school property and in violation of a school regulation, wearing black armbands as a symbolic act to publicize their objections to the hostilities in Vietnam does not concern aggressive, disruptive action or even group demonstration, but involves direct, primary First Amendment rights akin to "pure speech." It said that:

> "In order for the State * * * to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint. Certainly where there is no finding and no showing that engaging in the forbidden conduct would 'materially and substantially interfere with the requirements of appropriate discipline in the operation of the school' the prohibition cannot be sustained."

*Wood v. Georgia,* 370 U. S. 375, 8 L.Ed.2d 569, referred to earlier, involved the statements in the press of an elected sheriff accusing judges who had formulated instructions to a grand jury regarding the investigation of alleged sales of Negro votes, of race agitation and an

attempt at judicial intimidation of Negro voters and leaders, and comparing the calling of the grand jury to the activities of the Ku Klux Klan. The State courts convicted the sheriff of contempt. The Supreme Court reversed, holding that the convictions violated the rights of free speech since the record did not show that the statements constituted a clear and present danger to the administration of justice.[5] In *Swaaley v. United States* (Ct. Cl.), 376 F. 2d 857, Swaaley, a naval shipyard worker, wrote the Secretary of the Navy a petition for redress of grievances which included charges that some of his superior officials were guilty of favoritism in the matter of promotions. He was discharged. The Court held that the defamatory statements were not shown to have been wilfully false or made with reckless disregard for truth or falsity and that Swaaley's discharge was improper. A similar ruling was made by the same Court in *Burkett v. United States,* 402 F. 2d 1002. See, too, *Murray v. Vaughn* (U.S.D.Ct. D.R.I.), 300 F. Supp. 688, 703-705, which involved a Peace Corps volunteer, and *Puentes v. Board of Education* (N.Y.), 250 N.E.2d 232, in which a teacher (a union official) wrote letters to teachers and administrators within the school district that criticized the failure of the school administration to renew the employment of a probationary teacher and was suspended without pay. The Court of Appeals of New York cited *Pickering* and said:

> "There is no suggestion in the record that petitioner's indiscretions led to any deleterious effects within the school system and it is unlikely that they should have. Indiscreet bombast in an argumentative letter, to the limited extent present here, is insufficient to sanction disciplinary action * * *.
>
> "* * * Concededly, petitioner's direct teaching and in-class performance were correct and

---

5. Cf. Baltimore Radio Show, Inc. v. State, 193 Md. 300, 323-331, cert. den., 338 U. S. 912, 94 L.Ed.562.

not affected by the writing or sending of the letter."

See also the prior case of *Tepedino v. Dumpson* (N. Y., Fuld, C.J.), 249 N.E.2d 751, involving social workers.

In the case of *In re Gioglio* (Middlesex County Ct., N. J.), 248 A. 2d 570, 575, cited above, a policeman gave an interview critical of the operation of the department to a newspaper reporter in violation of a regulation. It was held that he could not be punished as the department had sought to do. Said the Court:

"The privilege of public employment and the right of free speech are not incompatible, nor are they mutually exclusive. * * * The public employee may speak freely so long as he does not impair the administration of the public service in which he is employed."

The Court then reiterated the rule that the burden is on the State to show that there is a compelling public interest which warrants the restriction of First Amendment rights and that in the absence of such a showing these rights are not subject to impairment or destruction. There are similar rulings in *Donovan v. Mobley* (U.S.D.Ct. C.D.Cal.), 291 F. Supp. 930, 933, which dealt with the disciplining of a lifeguard by a police department because of public statements.

In *Los Angeles Teachers U. v. Los Angeles City Bd. of Ed.* (Cal. In Bank), 455 P. 2d 827, teachers while on school property (although during duty free lunch hours) circulated for signatures petitions relating to public education financing and addressed to various concerned public officials, all contrary to regulations. Free speech prevailed. The Court said (p. 830):

"When, as here, the impairment of First Amendment rights appears, and when, as here, the facts constituting such impairment are not contradicted, the question as to whether such

impairment is permissible is one of law and not of fact * * *,"

and held (p. 835) that the State had

"failed to demonstrate the existence of 'facts which might reasonably have led [it] to forecast substantial disruption of or material interference with school activities' (*Tinker v. Des Moines* * * *) as a result of [the teachers] proposed activity. Rather [the State has] shown only that they reasonably apprehend the sort of unrest which inevitably results from the expression of controversial views but which must be tolerated in the schools as well as in society generally. * * *

"Similarly [the State has] failed to demonstrate that a significant threat to the 'efficiency and integrity of the public service' * * * is posed by [the teachers] proposed activity."

A late case is *Pred v. Board of Public Instruction of Dade County, Fla.* (5th Cir.), 415 F. 2d 851, 857-860. *Cf. Watts v. Seward School Bd.* (Alaska), 454 P. 2d 732, *petition for cert. filed,* 38 U.S.L.W. 3096 (No. 573) ; *Goldwasser v. Brown* (D.C. Cir.), 417 F. 2d 1169, 1176-77; *Ruderer v. United States* (Ct. Cl.), 412 F. 2d 1285, 1290-1292.

*Meehan v. Macy* (D.C. Cir.), 392 F. 2d 822, which Judge Sodaro found controlling and in which the Commissioner finds great solace, does not control, in our view, for various reasons. First, there the Court's sustaining of the dismissal of a police officer of the Canal Zone was based on the seemingly permissible finding that a letter and a poem printed and distributed by the policeman harmed the police department. The publications were found to be "intemperate and sarcastic," "invective," and "a contemptuous and defamatory lampoon" of the Governor of the Zone. Assuming the case to have been rightly decided, what the policeman there said was far worse

than Brukiewa's statements which in effect were that the Commissioner's honest judgment was unsound in certain matters and that various of his policies were not, in the belief of Brukiewa, good for the policemen, the Department or the public. Second, the Court's reasoning and philosophy are not in accord with the reasoning and philosophy of *New York Times* and *Pickering*. Third, the case was decided by a division of three judges and after *Pickering* was decided, the Court ordered a rehearing before all ten judges sitting *en banc*, which, the Court held, had the effect of vacating the opinion and order of the division of three judges. After the rehearing a majority of all ten judges, over the vigorous dissent of three, ordered on May 12, 1969, that the charge which the division of three judges had said justified Meehan's discharge be reexamined below in the light of *Pickering*.[6]

Brukiewa challenged the Rules and Regulations of the Police Department as vague and overbroad. In deciding the case as we have, we have assumed that on their face the Rules and Regulations are valid except to the extent that they inhibit or hamper the right of free speech guaranteed by the First Amendment.

Our holding in the case is no more than a determination that the State did not show that Brukiewa's statements hurt or imperiled the discipline or operation of the Police Department and therefore were within his right to make, under the First Amendment, and the decisions of the Supreme Court.

> *Order reversed, with costs, and case remanded for passage of an order reversing the disciplinary actions of the police commissioner against appellant, Brukiewa.*

---

6. Since the Court's opinion of May 12 has not been published, we have set it out in an Appendix to this opinion.