Elizabeth Anna **DUKE**

v.

**NORTH TEXAS STATE UNIVER-
SITY et al.**

Civ. A. No. 1977.

United States District Court,
E. D. Texas,
Sherman Division.

Sept. 1, 1971.

Sylvia M. Demarest, Dallas, Tex., for plaintiff.

W. O. Shultz, Asst. Atty. Gen., Austin, Tex., for defendants.

Lucius Bunton, Odessa, Tex., for Mr. Shur, a member of the Board of Regents.

## MEMORANDUM OPINION AND ORDER

JUSTICE, District Judge.

Plaintiff, Mrs. Elizabeth Anna Duke, seeks a preliminary injunction pursuant to Rule 65, Fed.R.Civ.P., reinstating her as a teaching assistant at North Texas State University.

During the academic years of 1967–68 and 1969–70, plaintiff was employed as a teaching assistant in the English department of North Texas State University. Prior to July 30, 1970, plaintiff again received and accepted an offer for a teaching assistantship at the University for the academic year 1970–71. Subsequently, on each of the evenings of July 30 and August 3, 1970, plaintiff, at "rock" concerts held in the park on the campus of North Texas State University, made a speech over a public address system to the crowd gathered to hear the music. The speech on July 30 was on the general subject of oppression. Beginning by describing conditions on the local level, plaintiff strongly criticized the University administration and

the official policies of the University and cited the University as a prime oppressor of human beings. During the course of the speech, plaintiff stated that the "system" as represented on the local level at the University "fucks over" students, and that the Board of Regents was an example of a group that has power in the system on the local level. Plaintiff then proceeded to give examples of oppression throughout the United States and concluded by calling for students to work together to change the system. Plaintiff's speech on August 3 was in response to the shutting down of the August 3 concert by the University security police. In her harangue, plaintiff stated her opinion that the concert was being shut down because speakers on July 30 had been critical of the University. On August 25, 1970, plaintiff was informed by Acting President Carter that the offer of the teaching assistantship for the academic year 1970–71 was rescinded on the "basis of written statements reporting her use of obscene language and conduct unbecoming an instructor in front of students and others on the University campus." Plaintiff appealed her dismissal to the President's Cabinet. On November 5, 1970, that body published findings upholding plaintiff's dismissal on the following grounds:

(1) The participation of plaintiff in organizing and appearing on the program at the July 30 and August 3 concerts held in violation of the rules and regulations of the University;

(2) The lack of academic responsibility demonstrated by plaintiff by her actions and statements upon the occasions in question;

(3) Failure of plaintiff to register for at least six hours in the fall semester of 1970 at the University. Plaintiff further appealed to the Board of Regents which finally approved, in February, 1971, the findings of the President's Cabinet and affirmed her dismissal.

The law governing the merits of this controversy may be stated simply. The public school teacher does not, as a condition of employment, waive his rights of freedom of speech and assembly guaranteed by the First Amendment of the Constitution. At the same time, however, "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." Pickering v. Board of Education, 391 U.S. 563, 569, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968). In applying these rather obvious principles the difficulty arises in striking a balance between the interests of the teacher as a citizen in commenting upon matters of public concern and the interests of the state in efficiently and effectively maintaining its system of public education. Slochower v. Board of Higher Education, etc., 350 U.S. 551, 555, 76 S.Ct. 637, 100 L.Ed. 692 (1956).

Recognizing the difficulty attendant upon striking this balance, the Court of Appeals for the Fifth Circuit has wisely cautioned against development of the merits of a teacher dismissal case at the district court level, when the school constituted review body has not had the opportunity to thrash out the matter in compliance with minimum standards of procedural due process. Ferguson v. Thomas, 430 F.2d 852, 858 (5th Cir. 1970); Sindermann v. Perry, 430 F.2d 939, 944 (5th Cir. 1970).

Pursuant to the admonition of the Court of Appeals, it is the duty of this court, first, to decide whether the review procedure followed in this case afforded plaintiff the procedural due process to which she is entitled. Proper consideration of this question requires that a distinction be made between the procedural due process to which tenured teachers and to which teachers with an expectancy of reemployment are entitled on the one hand; and the procedural due process to which non-tenured teachers and teachers having no expectancy

of reemployment are entitled on the other hand. Ferguson v. Thomas, *supra* 430 F.2d at 856; Sindermann v. Perry, *supra* 430 F.2d at 943.

■■ It is apparent that plaintiff must be classed as a teacher with an expectancy of reemployment. The offer of the teaching assistantship sent to her by Dr. Belcher, Chairman of the Selection Committee, stated in pertinent part: "Please bear in mind that employment is dependent upon enrollment and that, for that reason, no formal contract will be issued. *It has been our experience, however, that promised sections have always developed.*" (Emphasis added.) The University argues that under Section 6 of the then current Fiscal Regulations, all contracts other than for equipment and supplies were subject to the approval of the President or Vice-President for Fiscal Affairs, and until such approval was given, plaintiff could not have had an expectancy of reemployment. The University's contention, however, is based on a too technical interpretation of the term "expectancy of reemployment." The test, as this court interprets *Ferguson*, is not whether the dismissed teacher could successfully maintain a suit for damages based upon contract, but whether under all the circumstances the teacher could reasonably expect to be employed. In the instant case, plaintiff could reasonably expect that she would ultimately teach at least one section of Freshman English. The University by its own admission stated in the offer that the promised sections always developed. No evidence was offered by the University tending to show the frequency that similar offers were rescinded by the University and that plaintiff had any knowledge of the likelihood or possibility of rescission; or to show that plaintiff was unreasonable in assuming she would be entitled to teach at least one section.

In *Ferguson*, the Court of Appeals held that a tenured teacher or a teacher with an expectancy is entitled to the following minimal procedural standards:

(a) notification of the cause for termination in sufficient detail to enable the teacher to show any error that may exist;

(b) notification of the names and nature of the testimony of witnesses against him;

(c) provision for a meaningful opportunity for the dismissed teacher to be heard in his own defense;

(d) availability of a tribunal to hear the matter that possesses some academic expertise and that has an apparent impartiality toward the charges; and

(e) assumption by the college or university of both the burden of instituting the review proceedings and the burden of proof of any fact issues arising at the review proceedings.

When the hearing afforded the dismissed teacher is deficient in one or more of the requirements set out above, the district court, pursuant to *Ferguson*, should remand the matter to the educational institution for compliance with these minimum federal standards, in order that the matter can first be made ripe for court adjudication by the school authorities themselves.

In the instant case, the University satisfied each minimal procedural standard except the standard requiring the reviewing tribunal to possess an apparent impartiality toward the charges. By a letter on September 9, 1970, Acting President Carter fully informed plaintiff of the charges against her and attached to the letter a list of witnesses for the University along with signed statements by these witnesses. A hearing was scheduled at which plaintiff was represented by counsel and at which she had the right to confront and cross-examine the University's witnesses as well as present evidence in her own behalf. Furthermore, the President's Cabinet was composed of four individuals who undoubtedly possessed sufficient expertise to be able to deal with the subject matter of plaintiff's dismissal. The court cannot, however, escape the conclu-

sion that the Cabinet did not possess the requisite apparent impartiality toward the charges against plaintiff. Acting President Carter in his letter of August 25, 1970, informing plaintiff of her dismissal, stated that he was acting at the direction of the Board of Regents. Thus the Board had already made its position in the Duke affair known prior to the September 23 hearing before the President's Cabinet. It is, of course, possible that one in the position of Acting President Carter would be free, contrary to the expressed wishes of his employer, to act as his conscience directed after hearing plaintiff's presentation of her case; but such is not the common understanding of such situations. At any rate, the atmosphere of apparent impartiality is far from being preserved. Acting President Carter's presence on the Cabinet would alone be enough to violate procedural due process, but it also appears that the remaining three members of the cabinet were, like Mr. Carter, University administrative officers directly responsible to the Board of Regents. Under these circumstances, the court cannot rule that the Cabinet possessed apparent impartiality toward the charges.

■ Ordinarily, at this point, proper disposition by this court would require a remand to the University authorities with orders to constitute a reviewing body possessed of "apparent impartiality". The court finds, however, that the extraordinary circumstances of this case make it unlikely that a reviewing board possessing apparent impartiality could be constituted from faculty or administration of the University. The Board of Regents has made abundantly clear its feelings on the matter in controversy. Acting President Carter's initial action in dismissing plaintiff came at the order of the Board of Regents. Furthermore, the Board, in February of 1971, after reviewing plaintiff's appeal from the action of the President's Cabinet, approved the findings of the Cabinet published on November 5, 1970, and affirmed its original decision to dismiss

plaintiff. Under these circumstances, it is doubtful if any member of the University faculty or administration would feel free, if the evidence so required, to act contrary to the stated wishes of the ultimate source of authority in the system. Evidence at the hearing before this court was introduced to show that a reprisal, in the form of being passed over for promotion, had in fact already been taken against a professor in the political science department, for his participation in the Duke affair as a representative for the American Association of University Professors. Finally, this court is persuaded that additional hearings before a school-constituted review board could not further aid in making this controversy ripe for adjudication. At the hearing before the President's Cabinet, both the University and plaintiff were represented by able counsel. Both parties adduced evidence to support their respective positions and took advantage of the opportunity to cross-examine opposing witnesses. A complete transcript was made of the hearing and findings by the Cabinet were formally published by November 5, 1970. Nothing appears in the record of the hearing to indicate that either the University or plaintiff was denied an opportunity to develop the record as fully and as completely as was desired. No such objection was raised by either party in the proceedings before this court. In light of the above considerations, this court finds that, to remand the instant controversy for further hearing at the University level would be a needless waste of time, and that the matter is fully ripe for adjudication before this court. Sindermann v. Perry, *supra*, 430 F.2d at 945.

■ Proceeding now to the merits of this case, it is noted, again, that plaintiff is requesting a preliminary injunction pursuant to Rule 65, Fed.R.Civ.P. To qualify for such relief plaintiff must show: (1) that in the absence of such relief she will suffer irreparable damage; and (2) that her cause is such that she will probably prevail at the full scale

hearing on the merits. For the reasons set out below, I am of the opinion that plaintiff is entitled to the relief requested.

■ As was stated earlier, according to the findings of the President's Cabinet, plaintiff was dismissed for substantially the following reasons:

(1) Participation in concerts allegedly held in violation of rules and regulations of the University;

(2) Lack of academic responsibility demonstrated by plaintiff by her action and statements at the concert; and

(3) Failure of plaintiff to register for at least six hours in the fall semester of 1970.

Under *Ferguson*, plaintiff had an expectancy of reemployment, hence the University was required to assume the burden of proving the charges it brought forward against her as reasons for its action of dismissal. Regarding findings (1) and (3) of the Cabinet, the University did not discharge its burden. Although there was testimony in the hearing before this court concerning the alleged holding of the concerts in violation of the rules and regulations of the University, there is not a scintilla of evidence in the transcript of the Cabinet hearing touching the matter of violation of rules and regulations, much less evidence that would rise to the dignity of substantial evidence. Moreover, Finding (3) appears to be a sophistic afterthought. It borders on the nonsensical to assert that plaintiff was dismissed on August 25 because of her failure to register for school on August 26.

■ Obviously, then, the Cabinet based its action on substantially the reasons set out in Finding 2, *i. e.*, (a) public expression of an instructor of criticism of the university administration and policies; and (b) use in that connection, of language that may be classified as profane. If the only ground for dismissal were plaintiff's public expression of criticism of the university administration and policies, then this case would be on all fours with

Pickering v. Board of Education, 391 U. S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). Plaintiff, like Pickering, did not occupy a position requiring a close working relationship with any of those she criticized. Her position as instructor was not one that would require confidentiality with those whom she criticized. In making the criticism, she did not use inside information that the Board would have difficulty in rebutting. Indeed, it is undisputed that during the course of the speeches, plaintiff did not once identify herself as an instructor. Under these circumstances, to uphold the dismissal of plaintiff on the basis of the substantive content of the speeches would be to seriously violate her right of freedom of speech.

In addition to the factor of plaintiff's criticism of the administration, the other factor motivating the Cabinet was that plaintiff admittedly embellished her criticism with the phrase, "fucks over." The University contended that plaintiff also called the Board of Regents a "stupid bunch of motherfuckers." Plaintiff denied making this statement, and was supported by several witnesses who positively denied hearing her apply this epithet to the Board. None of the University witnesses, who had previously signed statements, knew plaintiff personally, nor were any of these witnesses able at the hearing to identify plaintiff as the person who made the speeches in question. Moreover, the statements of the University witnesses, who did not testify at the hearing before this court, were conflicting in several particulars. The opinion of the court as to what was actually said by plaintiff is further buttressed by the fact that the subject of the speech was oppression. Uncontradicted evidence introduced at the hearing before this court was to the effect that, to the younger generation, the compound verb "fuck over" means "oppress." Thus, the use of the phrase was entirely consistent with the general tenor of plaintiff's remarks. The phrase "stupid bunch of motherfuckers," however, refers to the mental competency of the

Board and is inconsistent with the general tenor of the speech. Accordingly, even giving weight, as required by *Ferguson,* to the deliberations of the Cabinet, the court cannot accept the finding by the Cabinet in regard to plaintiff's use of profanity to the extent that such a finding attributes to plaintiff statements other than those she has herself admitted making.

■ It is easy to infer that the real cause of plaintiff's dismissal, aside from her criticism of the Board of Regents, was her use of the verb "fuck over." It remains, then, to determine whether the University can constitutionally dismiss her for public use of that term under the circumstances of the instant case. If plaintiff were not a University instructor, it is clear that the state could not punish her simply for using profanity in a public speech without a showing of something more. *See* Cohen v. California, 403 U.S. 15, 91 S.Ct. 1780, 29 L. Ed.2d 284 (1971). Here, however, the question becomes whether, on balance, the interest of the state in maintaining its public educational institutions outweighs the interests of Mrs. Duke as a University instructor and citizen in using "fucks over" to add emotive content to her public utterances outside the classroom on subjects of national and local concern. Neither in the Cabinet hearing nor in the hearing before this court did the University produce any persuasive evidence concerning the scope of its interests or concerning the manner in which its interests had been infringed. There was, for instance, no showing that teachers who publicly use profanity are as a class more or less likely to be inferior teachers. There was no showing that use of profanity by a teacher in front of students is likely by itself to cause the students to disrespect the teacher and thus tend to disrupt the school system. Moreover, there was no showing that use of profanity outside the classroom indicates that the teacher is of bad moral character or is unsuitable competently to discharge the important tasks the state places upon him to direct and shape the minds of the students entrusted to him. Here, on the contrary, all the evidence tends to establish that plaintiff was a competent teacher.

■ The Constitution protects emotive speech as well as cognitive speech, when such speech is unsullied by circumstances giving the state an interest outweighing the interest of the speaker in communicating. It is not contended here that plaintiff's words threatened breach of the peace as in Chaplinsky v. New Hampshire, 315 U.S. 568, 573, 62 S.Ct. 766, 86 L.Ed. 1031 (1942); or that her words were obscene as that term is defined in Roth v. United States, 354 U. S. 476, 489, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957); or that the college campus was an inappropriate place to hold a public and peaceful gathering of students for the purpose of airing a political philosophy as was the curtilage of the jail in Adderley v. Florida, 385 U.S. 39, 47, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966); or that plaintiff's audience was captive and unwilling as was the audience in Kovacs v. Cooper, 336 U.S. 77, 89, 69 S.Ct. 448, 93 L.Ed. 513 (1949). The University has approached this matter as if plaintiff, by the mere incantation of the words "fucks over," could taint her listeners and the University in some manner, thereby justifying exorcism of this idiom and its user from the environs of the University. Words in and of themselves are not possessed of mystical and magical qualities. Words are to be judged solely by their communicative value, which, in turn, is gauged by the emotive and cognitive content with which the words are capable of being filled. That the use of one word in lieu of another may conform more closely to canons of good taste does not justify severe sanctions against those who use the offending word. To prohibit particular words substantially increases the risk that ideas will also be suppressed in the process.

The University at the Cabinet hearing produced no evidence that tended to show that plaintiff violated University regulations by organizing and speaking at the concerts of July 30 and August 3. At the hearing before this court, however, some evidence was produced to show that plaintiff did help organize the concerts and that the concerts were held without formal approval contrary to University regulations. Assuming for the moment that such evidence is true, other evidence established that the concert organizers attempted to comply with University rules, but were rebuffed by the University administration. The evidence indicated that, early in the summer of 1970, the organizers approached the assistant dean of students seeking to obtain approval for the staging of "rock" concerts in the park. The dean, at that time, stated that he thought approval could not be obtained, since no campus student organization was operative during the summer months, and that a spontaneous gathering did not require sponsorship. Subsequently, at least two concerts were held in the park by the students prior to the events in controversy in this case. The University administration did not object to these concerts in any manner, nor did it seek to shut the concerts down or otherwise regulate the use of the park. The University thus tacitly approved the use of the park and the students were justified in believing that approval extended to the concerts of July 30 and August 3.

■■■■■ Furthermore, even assuming that the University had never tacitly given its consent to the use of the park, its contention that the concerts were not properly sponsored by a recognized student organization is still beset by serious infirmity. This court recognizes that the University has a legitimate interest in efficiently managing the use of its facilities for the benefit of the entire university community. The University may, pursuing that interest, promulgate regulations reasonably related to the end sought. Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). Indeed, the University claims here that the regulation requiring sponsorship by a recognized campus organization is a reasonable regulation. This contention is supported by the decision of the three-judge district court in Stacy v. Williams, 306 F.Supp. 963, 972, 979 (N.D.Miss.1969). The court in that case approved a regulation requiring the sponsorship of an organized student or faculty group, recognized by the head of the university as a prerequisite for approval of an invitation of an outside speaker to speak on campus. The question of the validity of rules regulating use of university facilities by ad hoc student groups was not before the court, however. The *Stacy* case cannot, therefore, be read to mean that the university could arbitrarily refuse to recognize an ad hoc student group and thereby prevent its sponsorship of a speaker unpopular with the university administration; or prevent its use of university facilities to discuss the furtherance of some cause unpopular with the administration. On the contrary, if sponsorship by a recognized organization is to be a prerequisite, then the University must, at the very least, provide a procedure whereby ad hoc groups can quickly, before issues become mooted by the passage of time, gain recognition. See Hammond v. South Carolina State College, 272 F.Supp. 947, 950 (D.S.C.1967), cited with approval in Tinker v. Des Moines Independent Community School District, *supra*, 393 U.S. at 512, 89 S.Ct. 733. No evidence was offered to show that during the events in controversy here the University had any procedure established whereby an ad hoc group could gain recognition. The court has made a careful search of the Student Handbook, 1970–71, and is unable to find regulations pertaining to such a procedure. Moreover, it appears that the assistant dean of students had told the organizers that, during the summer, no sponsorship

could be obtained, since no campus organization was operative. This evidence would further indicate that a procedure had not been established. Otherwise, the dean would have told the organizers about it.

The regulations in their present form have the effect of preventing those students who are not members of any recognized campus organization from assembling on University property. Enforcement of the regulations therefore presents a case of invidious discrimination and is a denial of equal protection. *Cf.* Cox v. New Hampshire, 312 U.S. 569, 576, 61 S.Ct. 762, 85 L.Ed. 1049 (1941). The regulation being invalid, the University, of course, cannot dismiss plaintiff for violating it.

Nothing said here is to be taken to prohibit the University from requiring those using its facilities, both organization members and non-members, to comply with reasonable regulations, such as advance application, the making of security deposits, the payment of rental, and the myriad of other matters that must be regulated in order to effectively regulate speech situations.

From what has been heretofore stated, it should be clear that the court deems that plaintiff has made a showing that she has a probable right to the relief asked for. The court also finds that unless plaintiff is reinstated, she will suffer irreparable damage because of further disruption in the pursuit of her profession and education. Money damages would be a poor substitute to afford plaintiff in lieu of allowing her to reenter into the life of the University clothed with her former rights, privileges, duties and expectations. Accordingly, it is

Ordered that pursuant to Rule 65, Fed.R.Civ.P., plaintiff be, and hereby is, fully reinstated according to the terms of the original offer of Dr. W. F. Belcher, Chairman of the Selection Committee.