Elizabeth Anna DUKE, Plaintiff-Appellee,

v.

NORTH TEXAS STATE UNIVERSITY, et al., Defendants-Appellants.

No. 71-3198.

United States Court of Appeals, Fifth Circuit.

Nov. 10, 1972.

Rehearing and Rehearing En Banc Denied Jan. 10, 1973.

---

Crawford C. Martin, Atty. Gen., W. O. Shultz, II, Asst. Atty. Gen., Austin, Tex., Lucius Bunton, Odessa, Tex., James C. McCoy, Asst. Atty. Gen., Austin, Tex., for defendants-appellants.

Sylvia M. Demarest, San Antonio, Tex., Edward Bradbury Cloutman, III, Dallas, Tex., for plaintiff-appellee.

Before AINSWORTH, GODBOLD and MORGAN, Circuit Judges.

AINSWORTH, Circuit Judge:

Mrs. Elizabeth Anna Duke filed this complaint on May 13, 1971, against North Texas State University[1] pursuant to 42 U.S.C. §§ 1981[2] and 1983[3], alleging that the University violated her

1. Also joined as defendants were John L. Carter, Jr., Acting President of the University, and all his successors in office; A. M. Willis, Chairman of the Board of Regents for the University; and all members of the Board of Regents, namely, E. C. Pannell, Dean Davis, E. Bruce Street, David James Lawson, Earnest Shur, Carroll Sullivant, Gus S. Wortham and Berl Godfrey.

2. 42 U.S.C. § 1981 reads as follows:
"All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." (1964).

3. 42 U.S.C. § 1983 reads as follows:
"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects,

First, Fifth and Fourteenth Amendment rights pertaining to freedom of speech and due process of law when it withdrew an offer to employ her as a teaching assistant for the academic year of 1970–71. After a hearing, the District Court, 338 F.Supp. 990, entered a preliminary injunction on September 1, 1971, ordering defendants to reinstate Mrs. Duke as a teaching assistant. We reverse.

Mrs. Duke received notice of her termination as well as the reasons for termination in a letter dated August 25, 1970, from the Acting President of the University, John L. Carter, Jr. The letter gave her an opportunity for an administrative hearing before the President's Cabinet, which consisted of Mr. Carter and three vice presidents of the University. She took advantage of the opportunity. At the hearing held on September 23, 1970, Mrs. Duke was present and represented by counsel and the University was represented by an Assistant Attorney General of the State of Texas. The parties presented evidence and cross-examined witnesses. Following the hearing, the President's Cabinet decided not to rehire Mrs. Duke and entered written findings as follows:

"On the evenings of July 30, 1970, and August 3, 1970, Mrs. Elizabeth Duke appeared before and made an address to an unauthorized and unsponsored group meeting in the park on the campus of North Texas State University. Mrs. Elizabeth Duke participated in the organization of such meetings and in distributing leaflets announcing such meetings which were a planned effort to bring a subculture group into the official orientation program of the University.

"The audience which Mrs. Elizabeth Duke addressed upon these two occasions included persons who had been enrolled as students in prior semesters at the University as well as persons who would be freshmen students at the fall semester of 1970.

"During the course of her address to the crowd on both occasions Mrs. Elizabeth Duke used profane and obscene language. Her statements discredited the University administration and the governing board of the University and were critical of the manner in which the University is operated and maintained.

"The withdrawal of the offer to employ Mrs. Elizabeth Duke as a teaching assistant for the academic year beginning in September of 1970 is sustained by the President's Cabinet for the following reasons:

1. By assisting in organizing and appearing upon the program at the meetings held in violation of the rules and regulations of the University upon the campus of North Texas State University on the evenings of July 30, 1970, and August 3, 1970, Mrs. Elizabeth Duke demonstrated an unwillingness on her part to respect and abide by the rules and regulations of the University and further encouraged and caused members of the student body to violate such rules and regulations.

2. The actions and statements of Mrs. Elizabeth Duke demonstrate a lack of academic responsibility required by Section II of the Statement on Academic Freedom at North Texas State University, in that: (a) her actions and statements before a group of students and her participation in meetings which violates the rules and regulations of the University impair her efficiency as a teacher and her judgment as a scholar, and (b) by her actions and statements upon the occasions in question, Mrs. Elizabeth Duke failed to recognize and appreciate that the public will judge North Texas State University and its teaching faculty by such statements and actions, thereby demonstrating the lack of professional integrity required of the

or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." (1964).

teaching faculty at North Texas State University.

3. The fact that Mrs. Elizabeth Duke did not enroll for at least six semester hours at the fall semester of 1970 at North Texas State University fails to comply with the requirements of North Texas State University concerning teaching assistant positions, as was set forth in the written offer to her.

"The President's Cabinet fully recognizes and appreciates the right of freedom of speech and of association which is accorded to Mrs. Elizabeth Duke by the Constitution of the United States. However, her rights of speech and association must be balanced against the interest of the University in promoting and maintaining an efficient university and a faculty which commands the respect of the student body and the community. The record before the President's Cabinet demonstrates that Mrs. Elizabeth Duke has exercised her rights of speech and association in a manner and to an extent such as to seriously impair, if not destroy, her effectiveness as an instructor in the organized academic program at North Texas State University.

"The President's Cabinet considers each of the foregoing, considered separately and apart, as sufficient cause for the withdrawal of the offer to Mrs. Elizabeth Duke to be a teaching assistant at North Texas State University for the academic year commencing September, 1970."

Mrs. Duke appealed the decision of the President's Cabinet to the Board of Regents, the governing body of the University. On February 26, 1971, the Board reviewed the decision of the Cabinet. Mrs. Duke spoke to the Board on her own behalf; in addition, her attorney argued orally and submitted a brief of legal authority. When the Board sustained the findings and action of the Cabinet, Mrs. Duke prosecuted this action in District Court.

■■ In Ferguson v. Thomas, 5 Cir., 1970, 430 F.2d 852, 856,[4] we held that a teacher with an expectancy of reemployment is entitled to certain minimal procedural guarantees, including the availability of "a tribunal that both possesses some academic expertise and has an apparent impartiality toward the charges. (Note the dictum in Pickering v. Board of Education, 391 U.S. 563, [at 578, n. 2,] 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)." In the present case the District Judge concluded that "the University satisfied each minimal procedural standard except the standard requiring the reviewing tribunal to possess an apparent impartiality toward the charges." The District Court reasoned as follows:

"Acting President Carter in his letter of August 25, 1970, informing plaintiff of her dismissal, stated that he was acting at the direction of the Board of Regents. Thus the Board had already made its position in the Duke affair known prior to the September 23 hearing before the President's Cabinet. It is, of course, possible that one in the position of Acting President Carter would be free, contrary to the expressed wishes of his employer, to act as his conscience directed after hearing plaintiff's presentation of her case; but such is not the common understanding of such situations. At any rate, the atmosphere of apparent impartiality is far from being preserved. Acting President Carter's presence on the Cabinet would alone be enough to violate procedural due process, but it also appears that the remaining three members of the cabinet were, like Mr. Carter, University administrative officers directly responsible to the Board of Regents.

4. It is unnecessary to decide, and we do not decide, whether or not Mrs. Duke in fact had an expectancy of reemployment at North Texas, because the University treated her cause as though she had such an expectancy by complying with the mandate of Ferguson v. Thomas, 5 Cir., 1970, 430 F.2d 852. See generally Board of Regents v. Roth, 408 U.S. 564, 569, n. 6, 92 S.Ct. 2701, 2705, n. 6, 33 L.Ed. 2d 548 (1972).

Under these circumstances, the court cannot rule that the Cabinet possessed apparent impartiality toward the charges."

(Appendix, pp. 50, 51.) The record does not demonstrate actual partiality on the part of the President's Cabinet or any of its individual members despite Mrs. Duke's reference to the testimony of Clovis Clyde Morrisson, Jr., a Professor of Political Science. Professor Morrisson testified that his promotion from associate to full professor, as he understood it, was denied by the Board of Regents for reasons which bore in part a relation to his activities in the Duke matter. The promotion was denied despite the recommendation by his department, his Dean, and the Academic Vice President. Mrs. Duke argues that on the basis of the reprisal, "It thus becomes apparent that those under the employ of the Board of Regents at NTSU who go against the wishes of the Board can expect to be dealt with without mercy." In our view plaintiff's evidence relative to lack of impartiality of the President's Cabinet is inconclusive. The President's Cabinet cannot be deemed biased simply because the Board of Regents passed over Professor Morrisson for promotion. In the absence of evidence to the contrary, we must assume therefore that the Acting President and vice presidents acted independently and properly in these circumstances.

We decline to establish a *per se* rule that would disqualify administrative hearing bodies such as the President's Cabinet from hearing internal university matters solely for the reason that the members are employees of the Board and because some of them participated in the initial investigation of the incident and initiation of the cause under consideration. See Federal Trade Comm'n. v. Cement Institute, 333 U.S. 683, 702, 68 S.Ct. 793, 804, 92 L.Ed. 1010 (1948) (no denial of due process when commission expressed a view on the issue in advance of the case); French v. Bashful, 5 Cir., 1970, 425 F.2d 182, 184; Wasson v. Trowbridge, 2 Cir.,

1967, 382 F.2d 807, 813; Jones v. State Bd. of Educ., M.D.Tenn., 1968, 279 F. Supp. 190, 200 ("limited combination by a school administrative body of prosecutorial and judicatory functions is not fundamentally unfair in the absence of a showing of other circumstances, such as malice or personal interest in the outcome of a case"). Alleged prejudice of university hearing bodies must be based on more than mere speculation and tenuous inferences. As Judge Bell stated in his concurring opinion to Palmer v. Thompson, 5 Cir., 1970, 419 F.2d 1222, 1229, "Courts, including federal courts, must travel on proof and there was a failure of proof in this case on the part of plaintiffs." We are satisfied that the record here clearly demonstrates that Mrs. Duke received procedural due process of law.

"If no federal right has been violated in the procedures followed, then the court should next look to the record as developed before the academic agency to determine whether there was substantial evidence before the agency to support the action taken, with due care taken to judge the constitutionality of the school's action on the basis of the facts that were before the agency, and on the logic applied by it." Ferguson v. Thomas, 5 Cir., 1970, 430 F.2d 852, 858. A transcript was prepared of the testimony taken at the hearing before the President's Cabinet. This transcript, together with the record of the district court's hearing, shows that Mrs. Duke had been employed as a teaching assistant in the Department of English for the two academic years of 1967–68 and 1968–69. This position involved teaching English composition to freshmen students while she pursued a doctorate in English. During the Spring of 1970, she received an invitation from the English Department to teach for the academic year of 1970–71, which she accepted.

During the summer prior to the beginning of the 1970–71 academic year, the University scheduled a series of orientation sessions for incoming freshmen. These sessions lasted for two days and

two nights each, during which the students lived in the dormitories. The University gave tours around the campus and provided peer and academic counselors to help explain what to expect from campus life; how to determine what they would select as a "major"; what courses in which to enroll; and numerous other matters. Parents were invited to meet with the counselors and with representatives of the administrative branches of the University, such as the Dean of Students. The last act of the orientation program was registration for the forthcoming term. The freshmen then left the campus to return when the regular academic year commenced. Associate Registrar John H. Brown testified before the Cabinet that the purpose of the orientation program was to help the students make the transition from high school to college in a manner which would least hurt the individual: "The student has a difficult time making a transition from high school to college in most cases, especially one as large as North Texas."

The University scheduled freshmen orientation activities for July 30, 1970 and August 3, 1970, including a mixer dance on the evenings of those dates.

A group of students decided to conduct their own "orientation" program by holding "rock concerts" and "rap sessions" in a park located on the University's campus at the same time as the University's orientation activities. The concerts were announced in a leaflet[5] Mrs. Duke helped to prepare, and the leaflet was distributed by her and others. The leaflet was initially distributed at a freshmen orientation meeting in the auditorium of the Music Building. The group was asked to leave the building, and police were summoned. Subsequently, the leaflet was distributed on a sidewalk outside the building.

On the evening of July 30, Mrs. Duke spoke during intermission of the concert announced in the leaflet. In her motion for a preliminary injunction she described the substance of her address as "caustically" critical of the Board of Regents and administration of the University. Testimony indicates she additionally criticized the faculty, students, and American society in general. Mrs. Duke said in District Court that her comments were in the same tenor as an article she wrote for Denton's New World Press, February 17—March 2, 1971, set out in the margin.[6]

5. The leaflet reads as follows:

LOOK OUT KID THEY KEEP IT ALL HID!

What's happening to your head?

What part are you going to play in a world in revolution!

Who are you becoming

In the university you will be "educated" to play these roles:

Prisoner—told by someone else where you have to live (and, if you are a woman, what time you have to be in)

Yellow-topped card—sacrificing your own personal uniqueness (as well as real community) for the sake of efficiency

Sucker—paying high tuition while the fat cats get fatter

Sponge—passively soaking up information handed down by experts

Whore—selling your soul for a grade or degree

Smack freak—addicted to the heroin of white, middle class values

Ostrich—spending time with your head in a book learning irrelevant garbage (at most, classes are "interesting" or "stimulating") while the whole world is erupting

Climber—stepping on your brothers and sisters in order to get to the top

Dinosaur—perpetuating an obsolete system which cannot survive in the 21st century

Bolt—keeping a machine running which can only exist by chewing up the poor, non-white peoples of the world

DIG IT!

A new world is being born! New people are emerging! We are free to create the new world and to decide who we will be! Come to the park tonight at 7:30 to dig on some music and to rap about where we are and what we can create.

6.        Duke Tries Regents

After stalling for four months, the Board of Regents has finally scheduled my hearing for the last week in February. I was fired from my job as teaching assistant at NTSU in September for "obscene language" and "improper conduct."

A rock concert was also held on the evening of August 3, but was terminated by the University's security police, acting on instructions from Vice President

I would like to use the occasion of my hearing to place the Board of Regents on trial before the people. This board is composed of nine members—all white, all men, all rich. The average annual income of regents and trustees is $41,000 not including assets. This places them in the top ½ of 1 per cent of all people in the U. S. These men—directors of banks, insurance companies, investment companies, and other corporations—are members of the ruling class, the class which is responsible for the exploitation of poor and colored peoples all over the world. The regents run the university as they and their class run the world— to maintain their own vested interests.

In the first place, they run the university as a training center for forces who will keep the nation's economy running smoothly. The university not only supplies a force of people for building the empire but for defending it. The armed forces, which protect the business interests of the ruling class in Viet Nam, Laos, Cambodia, and all over the world, could not survive without the junior officers and career military personnel supplied by the ROTC.

The university also perpetuates a competitive, class society. Students are forced to step on each other to make it to the top, and students are brainwashed with the idea that they are superior to working class people and to black and brown people who do not attend the university.

The university also institutionalizes racism. Black, brown, red, and yellow people do not have proportional representation on the faculty and administration. The gifts of the history and culture of colored peoples are not emphasized. It is more difficult for a black person than a white person to enter the university because of screening devices which are geared to the type of education received primarily by white middle class people.

The university functions as a reinforcer of sexist attitudes. Women are led to believe that they are not as capable of making decisions as men are. Someone else decides for them where they will live and what time they have to come in. This type of brainwashing prepares them to live the life of a housewife who makes no important decisions about shaping the world. She provides her husband with sex and cheap labor, and she fills the role of consumer of unnecessary goods.

Women attend a university which is run by males who benefit economically and psychologically from maintaining a male-supremacist society.

The university teaches people to fear revolutionary change and to maintain the status-quo. Those who allow themselves to be brainwashed in this way are soon to become fossils of history.

The regents are indeed guilty of immoral acts. They are criminals, and their crimes are far more serious than mother-fucking. They insist on maintaining an imperialistic, militaristic, racist, sexist system which causes ⅔ of the people to go to bed hungry every night. The Board of Regents turns students at NTSU into robots, like themselves, whose fate is to become managers of a system which is already doomed to extinction.

These criminals find it necessary to engage in severe repression when their system is threatened. I was fired because I am part of an emerging movement which endangers the established way of life of the regents. Those in power became even more repressive when they were confronted by 1,000 students on the steps of the administration building on September 23. The administrators were so frightened that they sought to control us by calling in the Denton police—fully equipped with guns. They taught us a lesson all right. They taught us that political power comes out of the barrel of a gun.

The repression will increase as we become more effective. What can we do in the face of it? Well, for one thing we can stop playing their game. We have to stop begging for freedom, asking for favors, shaking an angry fist, reacting against their moves, asking them to change the system. We have to take power. Huey P. Newton says that "power is the ability to define phenomena and make them act in the desired manner."

We have already begun to define ourselves and the world we live in. We know that we are fucked over, yet we are not victims. We affirm life! We want to live! We know that we are all one and that we are responsible for the entire universe. We know that we must create a free society in which all of the people will share the resources, power, and wisdom. We know that we will defend what we create.

Live the revolution!

All power to the people!

—Betty Anne Duke

Lindley, because it was not properly sponsored. Mrs. Duke spoke after it was closed and gave another version of why it was closed down in a brief statement, the content of which is a matter of dispute.

The evidence taken before the Cabinet showed that Mrs. Duke used profanity on both occasions. Exactly what she said was in dispute, and the testimony conflicted.

Security Guard Fletcher testified before the Cabinet that on July 30 she spoke about different aspects of college life and used profane language over the loud speaker system. He was sure that Mrs. Duke referred to the Board of Regents as a "stupid bunch of m——— f———s" and that she stated that the girls would be locked up in the dorms like a bunch of whores. Mrs. Duke and other students denied using such language. Another security guard testified that Mrs. Duke urged the girls to violate dorm regulations as to hours. Again, this was denied. Student Gary Don Bessire, called by Mrs. Duke, testified that "She used words that commonly are thought of, what do they say, as profanity," and that she used the word "f———" with reference "to how the system f———s over the student, how the system f———s over us as people." She herself testified that while she didn't refer to the Board as a "stupid bunch of m——— f———s, she did say that the system as represented on the local level at the University "f———s over" people and talked about the Board of Regents as an example of people who have power on the local level.

■ "Freedom of speech . . . [is] among the fundamental personal rights and liberties which are protected by the Fourteenth Amendment from invasion by state action," Lovell v. City of Griffin, 303 U.S. 444, 450, 58 S.Ct. 666, 668, 82 L.Ed. 949 (1938), and the Fourteenth Amendment protects the citizen against all the creatures of the state— universities not excepted. West Virginia Bd. of Educ. v. Barnette, 319 U.S. 624, 637, 63 S.Ct. 1178, 1185, 87 L.Ed. 1628 (1943). Neither teachers nor students may be compelled to relinquish First Amendment rights they would otherwise enjoy as ordinary citizens to comment on matters of public interests concerning the operation of public schools in which they work. Pickering v. Board of Educ., 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968). See also Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969).

"Our Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned. That freedom is therefore a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom." Keyishian v. Board of Regents, 385 U.S. 589, 603, 87 S.Ct. 675, 683, 17 L.Ed.2d 629 (1967). There is "no room for the view that, because of the acknowledged need for order, First Amendment protections should apply with less force on college campuses than in the community at large," Healy v. James, 408 U.S. 169, 180, 92 S.Ct. 2338, 2346, 33 L.Ed.2d 266 (1972), and "nonrenewal of a nontenured public school teacher's one-year contract may not be predicated on his exercise of First and Fourteenth Amendment rights," Perry v. Sindermann, 408 U.S. 593, 599, 92 S.Ct. 2694, 2698, 33 L.Ed.2d 570 (1972).

■ "When a violation of First Amendment rights is alleged, the reasons for dismissal or for nonrenewal of an employment contract must be examined to see if the reasons given are only a cloak for activity or attitudes protected by the Constitution." Board of Regents v. Roth, 408 U.S. 564, 582, 92 S.Ct. 2701, 2711, 33 L.Ed.2d 548 (1972) (Justice Douglas dissenting). But "First Amendment rights must always be applied 'in light of the special circumstances of the . . . environment' [Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969)]

in the particular case," Healy v. James, 408 U.S. 169, 180, 92 S.Ct. 2338, 2345, 33 L.Ed.2d 266 (1972), and "[t]he constitutionally protected right of a public schoolteacher to criticize the school administration and to comment on matters of public concern is a limited right, a right which must be balanced against the need for orderly school administration. . . . Whether the activities of the school employee are protected under the First Amendment depends upon a weighing of the asserted interests." Moore v. Winfield City Bd. of Educ., 5 Cir., 1971, 452 F.2d 726, 728. A balance must be struck "between the interests of the teacher as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Pickering v. Board of Educ., 391 U.S. 563, 568, 88 S.Ct. 1731, 1735, 20 L.Ed. 2d 811 (1968). As Judge Clark noted in *Ferguson,* "The college had no right to control [Ferguson's] speech or to curtail his freedom of association, but they did have a right to terminate his employment as a classroom instructor at the point where the exercise of his constitutional privileges clearly over-balanced his usefulness as an instructor." Ferguson v. Thomas, 5 Cir., 1970, 430 F.2d 852, 859. See also Fluker v. Alabama State Bd. of Educ., 5 Cir., 1971, 441 F.2d 201, 207; Pred v. Board of Public Instruction of Dade County, Fla., 5 Cir., 1969, 415 F.2d 851, 857.

To effectuate the balancing of these competing interests, established by *Pickering,* this Court in *Ferguson, supra,* 430 F.2d at 859, said that fact findings by academic agencies, "when reached by correct procedures and supported by substantial evidence, are entitled to great weight, and the court should never lightly substitute its judgment for that of the board." "That courts should not interfere with the day-to-day operations of schools is a platitudinous but eminently sound maxim which this court has reaffirmed on many occasions." Shanley v. Northeast Ind. School Dist., 5

Cir., 1972, 462 F.2d 960. Courts are not equipped by either training or experience to select initially the faculty and staff for colleges and universities, and to enjoin a university to hire or rehire a member of its faculty goes beyond mere redress of constitutional rights of an individual. We "should interfere only where there is a clear case of constitutional infringement." Esteban v. Central Missouri State College, 8 Cir., 1969, 415 F.2d 1077, 1090 (per then Judge, now Justice Blackmun).

The District Court here rejected each of the three numbered reasons given by the President's Cabinet for withdrawing the offer of employment. See pages 832–833 *supra.* With regard to reason number two, i. e., that Mrs. Duke's actions and statements demonstrated a lack of academic responsibility, the trial judge held that "the dismissal of plaintiff on the basis of the substantive content of the speeches would be to seriously violate her right of freedom of speech"; he added that the Constitution protected her use of profanity here, because "[t]o prohibit particular words substantially increases the risk that ideas will also be suppressed in the process." While the District Court did not specifically allude to the University's conclusion, which was couched in the language of *Ferguson, supra,* 430 F.2d at 859, that "Mrs. Elizabeth Duke has exercised her rights of speech and association in a manner and to an extent such as to seriously impair, if not destroy, her effectiveness as an instructor in the organized academic program at North Texas State University," the Court did conclude that "all the evidence tends to establish that plaintiff was a competent teacher," and that the University did not "produce any persuasive evidence concerning the scope of its interests or concerning the manner in which its interests had been infringed." To take advantage of Pickering v. Board of Educ., 391 U.S. 563, 569, 88 S.Ct. 1731, 1735, 20 L.Ed.2d 811 (1968). Mrs. Duke argued that her statements were not directed toward any person with whom appellee would be in contact in the course

of her daily work as a teacher. The District Court agreed that Mrs. Duke "did not occupy a position requiring a close working relationship with any of those she criticized." The Court's fact finding on reason number two is not supported by the record for the following reasons.

Professor Howard A. Key testified before the Cabinet that he supervised Mrs. Duke's preparation for her master's thesis and had her in classes. He said she was an excellent student and recommended her to the selection committee as an instructor of English. However, Key testified that he would not recommend Mrs. Duke as a teaching fellow in the English Department following the incidents of July 30 and August 3. He stated:

"I would say that if she knew she were talking to students and used language of this kind that she was lowering the dignity of the teaching profession. . . .

"Well, I think it shows a lack of judgment to use four letter words to any group of people, I don't care what, for a teacher to do that, I don't care what their level of communication is. I think it is not the place of a teacher to try to get down on the lowest level of the lowest student and use the lowest kind of words he can find to communicate with that student. I think it is up to the teacher, to set an example in the use of language and I think that a teacher who does not realize that and will not do it should not teach."

Key, a teacher since 1947, said that whether a student could respect a teacher who used language of the kind in question depended almost entirely on the student and his background, but that a majority of students would be "affected, possibly adversely."

Professor Clifton, Chairman of the English Department, testified: "Well, I could not conceive of myself as having used language reputedly used by the Plaintiff, and would have considered myself ill fit for my profession." Profes-

sor Hall of the English Department testified in District Court that Mrs. Duke spoke with him and said she had used obscene language at a speech on a previous occasion. Hall testified that he considered Mrs. Duke's statements to cast an adverse reflection on him as a faculty member and that it was "irresponsible, unwise and unreasonable behavior, which I think reflects on all teachers at North Texas." After reviewing the leaflet prepared by Mrs. Duke, see n. 5 *supra* (setting out the leaflet), he testified that he did not think that it was in keeping with the responsibilities of a member of the teaching staff at North Texas to engage and participate in the preparation and distribution of the leaflet to a group of prospective students. He believed that Mrs. Duke's action "exhibits a complete lack of common sense and judgment, showing what seems to me, as nearly as I am able and qualified to judge, a complete metamorphosis in character. . . ." President Carter, who testified in District Court, particularly objected to the leaflet being handed out to freshmen during orientation, whose parents were on campus with them, because he thought, it maligned his faculty and made comments that were not true, such as the definition of "whore" as "selling your soul for a grade or degree."

The District Court concluded that "[n]either in the Cabinet hearing nor in the hearing before this court did the University produce any persuasive evidence concerning the scope of its interests or concerning the manner in which its interests had been infringed." The fallacy of this conclusion is apparent since it is evident that the interests the University sought to protect were to maintain a competent faculty and to perpetuate public confidence in the educational institution. That these interests of the University were infringed was made clear from the testimony from Professors Clifton and Hall, outlined above concerning the loss of respect for Mrs. Duke among the faculty and students, and in view of the testimony by Acting

President Carter about the adverse publicity in the newspapers.

Because reason two is adequate to support the Cabinet's withdrawal of the offer, we need not dwell on the Cabinet's first and third reasons. We note that the District Judge declared the University's rules on the use of university facilities to be unconstitutional. In our view this holding was erroneous and unnecessary to the decision in this case; further, plaintiff did not plead unconstitutionality nor did defendants therefore have an opportunity to rebut the question.

■ We should be mindful of the admonition of Chief Justice Burger: "The relatively placid life of the college campus of the past has not prepared either the administrators or students for their respective responsibilities in maintaining an atmosphere in which divergent views can be asserted vigorously, but civilly, to the end that those who seek to be heard accord the same right to all others." Healy v. James, 408 U.S. 169, 195, 92 S.Ct. 2338, 2353 (1972) (concurring). See also Rosenfeld v. New Jersey, 408 U.S. 901, 92 S.Ct. 2479, 33 L.Ed.2d 321 (1972) (Justice Powell dissenting); Rosenfeld v. New Jersey, 408 U.S. 901, 92 S.Ct. 2483, 33 L.Ed.2d 321 (1972) (Chief Justice Burger dissenting). As a past and prospective instructor, Mrs. Duke owed the University a minimal duty of loyalty and civility to refrain from extremely disrespectful and grossly offensive remarks aimed at the administrators of the University. By her breach of this duty, the interests of the University outweighed her claim for protection.

The dissent herein contains several errors and unsupported conclusions to which we believe a response is appropriate.

It is contended in the dissent that the question of the competency of the President's Cabinet to hear Mrs. Duke's case has not been directly considered by the majority opinion; that the opinion errs in failing to hold that the Board of Regents likewise was disqualified from reviewing Mrs. Duke's appeal from the President's Cabinet. The dissent, therefore, appears to be grounded on alleged lack of procedural due process by the University. Consideration of the merits and reasons for Mrs. Duke's dismissal is totally ignored—in fact, not even reached in the dissent.

It can hardly be said that the majority opinion does not consider the competency of the President's Cabinet to try Mrs. Duke's case. As has been pointed out in this opinion, we decline to establish a rule that would *per se* disqualify the President's Cabinet composed of the President and two Vice Presidents of the University, from conducting a hearing pertaining to the dismissal of one of its employees, a part-time teacher, merely because the teacher involved has made a broadside attack on the administration of the University, though in terms which are to say the least, vulgar and profane. This is especially true when the record fails to disclose actual bias or prejudice against Mrs. Duke on the part of any member of the President's Cabinet, and likewise of any member of the Board of Regents. The offending statements of Mrs. Duke were directed against the University administration in general, not against particular members thereof. She publicly expressed her remarks, threatened confidence in the institution and displayed her incompetence by the words she used. To get attention she used the Board of Regents as scapegoats though she did not single out any member of the Board.

The dissent cites Mayberry v. Pennsylvania, 400 U.S. 455, 91 S.Ct. 499, 27 L.Ed.2d 532 (1971), where the Supreme Court held that a trial judge could not adjudicate and punish contempt by a contemnor who had in his presence in open court called him a "dirty sonofabitch" and a "dirty tyrannical old dog," as well as other strong epithets. The distinction between this case and *Mayberry* is immediately apparent. The judge himself was the object of a personal attack during a judicial proceeding and was obviously disqualified. But the

dissent builds from the *Pickering* footnote cited in *Ferguson, supra,* its own ipse dixit that no University administrator, Cabinet or Board may try a teacher in a dismissal proceeding, if the offending statements by the teacher include an attack on the University administration and its Board. This would make it too easy for a teacher to disqualify University authorities from controlling personnel in the University. Under Texas law the Board of Regents is charged with the duty of controlling and managing the University. Vernon's Ann.Rev.Civ.Stat. of Texas art. 2651a, § 2 (1965).

Though the dissent states that under Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), recently decided, the University did not owe Mrs. Duke a hearing, it nevertheless contends that since she was accorded one, procedural due process was lacking because the hearing was before the wrong tribunal, that instead of being accorded a hearing by the President's Cabinet she should have had a hearing by the University Tenure Committee, composed of members of the faculty of the University. We find this reasoning difficult to follow. It has never been established that Mrs. Duke, a teaching assistant, was a member of the faculty. She was employed only for one year, part-time, and obviously had no tenure as the dissent concedes. The suspicion which the dissent attempts to place upon the President's Cabinet as an ad hoc tribunal for the hearing of Mrs. Duke's case, is unwarranted and not supported by the record. It is true that members of the President's Cabinet, at the request of the Board, investigated the facts and dismissed Mrs. Duke. But the Board of Regents instructed University authorities to dismiss Mrs. Duke only if an investigation of the facts showed that this course of action was necessary and proper under the circumstances. Mrs. Duke did not at any time during the administrative proceedings object to the hearing being held by the President's Cabinet or about review of her appeal being made by the Board of Regents, nor did she contend that the Cabinet and Board were incompetent to try her by virtue of bias or prejudice.

The dissent takes exception to the circulation by President Carter to the Board of Regents, prior to their review of the transcript of the hearing, of an extract from an issue of "Denton's New World Press" containing an article admittedly written by Mrs. Duke in which she again attacked the University administration and Board. The material in Mrs. Duke's article was intended for public consumption and was actually published. It did not introduce any new element in the case but corroborated testimony already given at the hearing as to Mrs. Duke's public statements about the Board. In her testimony in the trial court Mrs. Duke confirmed that the overall tenor of the article was the same as that in her earlier speeches which formed the basis for her dismissal. This is confirmed by an examination of the text of the article. (See footnote 6 ante.) We see no impropriety in President Carter sending copies of Mrs. Duke's article to members of the Board. The Board does not function like a court. Whereas a judge sits in a case, an administrator works on a case. See W. Gelhorn and C. Byse, Administrative Law Cases and Comments, p. 876 (1960). The Board should no more be disqualified here because it received the article from President Carter which appeared in the "Denton's New World Press" than if they read it in a daily newspaper. Careful consideration of the reasons set forth in the dissent reenforces our own view that reversal of the District Court decision in this case is required by both the law and the evidence.

Reversed.

GODBOLD, Circuit Judge (dissenting):

The District Court made a specific finding of fact, supported by a large body of evidence, that the President's Cabinet did not possess the "apparent impartiality" toward the charges which Ferguson v. Thomas, 430 F.2d 852, 856

(5th Cir. 1970), requires of an administrative hearing tribunal. This requirement is but a way of pointing out that to be qualified to hear the case the designated hearing body must be detached from the core of the controversy. The statement in *Ferguson* was based expressly upon a dictum of the Supreme Court in Pickering v. Board of Educ., 391 U.S. 563, 578 n. 2, 88 S.Ct. 1731, 1740, 20 L.Ed.2d 811, 823 n. 2 (1968):

> In the present case the trier of fact was the same body that was also both the victim of appellant's statements and the prosecutor that brought the charges aimed at securing his dismissal.

In this case our concern is with competence to sit, and not whether the body acted in a partial manner in the conduct of its business or in its decision.[1]

My brothers hold the actions of the President's Cabinet valid on the sole basis (ground 2) of appellant's actions and statements at the meetings of July 30 and August 3. In so doing they do not directly address themselves to the matter of the competency of the President's Cabinet to hear her case. Rather they explicitly assume that the Cabinet *acted* impartially and conclude that the plaintiff failed to produce evidence of *actual* partiality sufficient to override that assumption. If they mean that as a factual matter the President's Cabinet was sufficiently removed from the controversy that it was competent to conduct the hearing, they fail to comply with Rule 52, Fed.R.Civ.P., which protects findings of fact made by the district judge unless plainly erroneous, and, in addition, they simply ignore the evidence. If they mean that the decision of an administrative body not qualified to sit because of its connection with the controversy is valid unless it can be proved that it *acted* in a partial manner, they employ a erroneous legal standard. The District Judge recognized the necessity of the hearing body's detachment from the subject matter, and found it to be lacking. That decision should be affirmed.

The majority opinion appears to me incorrect for another reason as well. Under the correct legal standard the Board of Regents, which exercised administrative appellate review, did not meet the qualifications required of an administrative body participating in consideration of plaintiff's claim.[2]

*Ferguson* sets out in simple and brief language a set of guiding principles for institutional hearings. In the phrase "apparent impartiality" the key word "apparent" is not a mere gratuitous redundancy. It is used advisedly as a warning to the administrative body and those who designate it that, at the threshold, they must be alert to determine whether the tribunal is competent. Judicial bodies have the benefit of established principles and traditions, and knowledge of their proper application, to guide them in situations where they have interests adverse to the litigants and must determine whether disqualification may be required or recusal appropriate. The usual institutional hearing body will possess neither these traditional criteria nor specialized knowledge of their applicability. Also judicial bodies have the advantages of history, of established status and the trappings of office which, in addition to their decisions, assist them in creating their own image and aura and engendering public confidence in and respect for what they do. The institutional hearing body within a university lacks these collateral means for creating the confidence and support of those who are to utilize it. The viable institutional remedy must present a recognizable face of justice as well as dispense the fact of justice—what the Dis-

1. Except to the extent that biased actions may be evidence of lack of competency to hear the case.

2. The District Court, because it found the President's Cabinet disqualified as a hearing tribunal, did not need to consider the disqualification of the Board of Regents as reviewing body. In this court the majority, having rejected the decision as to the Cabinet, do not mention the patent disqualification of the Board of Regents to sit in appellate review.

trict Judge in this case described as "the atmosphere of impartiality."

The lash of Mrs. Duke's crude and offensive remarks was directed in general at the university administration (as distinguished from faculty and students)— "caustically critical" as the majority note—and in particular at the Board of Regents. The responsive action of which she complains came at the direction of the Regents and with the concurrence of the administration. I do not imply that either administrators or Regents were not high minded and honorable people. But it simply will not do that the speaker whose words have flayed, and who has been penalized for what she has said, is to have her objections to the penalty, and her appeal therefrom, at the hands of the persons who are her victims, accusers, investigators, prosecutors, and authors of the penalty as well. This is not judicial ivory towerism but common sense and everyday fairness in relationships between human beings.

Disqualification of the victim of verbal abuse to try his assailant is an established principle. Mayberry v. Pennsylvania, 400 U.S. 455, 91 S.Ct. 499, 27 L. Ed.2d 532 (1971), requires that a trial judge reviled by a contemnor must, if he waits until the trial's end to mete out contempt punishment, defer to another judge. In *Mayberry,* the trial judge had been called a "dirty sonofabitch," a "dirty tyrannical old dog" and other strong epithets. The Court concluded that "[n]o one so cruelly slandered is likely to maintain that calm detachment necessary for fair adjudication." *Id.* at 465, 91 S.Ct. 505, 27 L.Ed.2d at 540.[3]

In early August 1970, having just become Acting President of North Texas State University, Mr. John Carter learned of Mrs. Duke's actions of July 30 and August 3 and directed that an investigation be made. He reported the results of the investigation to a meeting of the Board of Regents on August 19, and the Regents instructed him to conduct additional investigation and to satisfy himself whether what appeared to be the facts was true, and if so to "dismiss" her. President Carter investigated further and on August 25 wrote Mrs. Duke that at the direction of the Board of Regents the offer previously made to her to serve as part-time instructor was withdrawn. The letter proffered her a right to appeal by requesting within three days a hearing before the President's Cabinet, which consisted of President Carter and his three Vice-Presidents, Lindsley, Spurlock and Rogers. On August 27 Mrs. Duke accepted the offer of appellate review procedures. The hearing before the Cabinet was scheduled for September 23, and Mrs. Duke was notified that the University would be represented by an Assistant Attorney General of the State of Texas. The hearing took place as scheduled.

These specific points must be catalogued:

(1) It is not clear who made the decision that the President's Cabinet be the hearing body. But it is revealed by

3. The citation in *Ferguson* of the *Pickering* footnote implies that an apparently impartial tribunal is at least one that has not been the subject of the statements by the dismissed teacher giving rise to the punitive action that is in question. Whether that would be so in every instance we need not decide—the issue for us is whether the administration and the Board of Regents of this particular university had been "so cruelly slandered [as to be] likely to maintain that calm detachment necessary for fair adjudication."

In Woodbury v. McKinnon, 447 F.2d 839 (5th Cir. 1971), we held that a hospital medical staff which stripped a physician of his surgical privileges was not disqualified to consider his qualifications merely because it had considered them on a previous occasion. In Fluker v. Alabama State Bd. of Educ., 441 F.2d 201 (5th Cir. 1971), nontenured teachers whose contracts were not renewed were granted hearings before the university's Advisory Committee on Faculty Personnel, composed of three professors elected by the faculty to consider faculty grievances. We did not reach the contention that the hearing body was not properly constituted because nontenured teachers were excluded from it.

President Carter, who had been with the university 16 years, that he had never before heard of the procedure employed in this case being used with reference to any teacher or teaching assistant nor had he ever heard of the Board of Regents, which he considered to be a hiring and not a firing body, dismissing any faculty member. The procedure employed in this case was an *ad hoc* procedure which by-passed administrative machinery established for handling cases such as this one (if not this very one). By approval of the faculty, the President and the Board of Regents, the university previously had adopted and had in force a detailed "Statement on Academic Freedom, Faculty Responsibility and Tenure of the Faculty, Administration and Board of Regents," based upon a similar document adopted by the Coordinating Board of the Texas Colleges and University System. This document prescribes administrative procedures for faculty dismissals where reason arises to question the fitness of a faculty member, that encompass several steps. They begin with a conference with the department head, followed by an inquiry by a tenure committee of the department. If the faculty member desires a hearing, it is conducted by the University Tenure Committee under pre-

scribed standards for right to counsel, examination of witnesses, and other rights of procedural due process.[4] Review of the decision of the University Tenure Committee is by the Board of Regents, who, if they do not sustain the Committee's decision, are required to return the case to the Committee for reconsideration and if necessary further evidence, and only after that reconsideration can the Regents overrule the Committee.

Since Mrs. Duke was without tenure, and her appointment for the preceding term had expired, the university proceeded on the basis that the procedure prescribed by the "Statement on Academic Freedom" did not govern her case.[5] While the District Court did not need to reach the point, it is not clear that the university's assumption was even correct. By its terms [6] the statement appears to be applicable under some circumstances to a teacher without tenure, whose appointment has expired, and whose contract is not renewed. This was precisely the situation of Mrs. Duke. However, whether Mrs. Duke fell within or without the formalized procedures is not determinative. The purposes of a hearing, and, if offered, and held, the necessity for its complying with pro-

---

4. The composition of the University Tenure Committee is not stated. The inference from requests by the faculty made to the university that the hearing be before that committee as representative of the faculty, is that it was composed entirely of faculty members.

5. Under Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), decided while this appeal has been pending, and changing the rule in the Fifth Circuit, the university would not have been required to give Mrs. Duke a hearing. This does not, however, dispose of the issue of whether, having offered her a hearing and appeal as parts of its administrative procedures for handling her claim, requirements of due process were met in the administrative process at both levels.

6. Section IV, of the "Statement," titled "Due Process for Faculty Dismissals," provides:

"(1) These dismissal procedures apply to a faculty member who has tenure, OR TO A NONTENURED MEMBER WHOSE TERM APPOINTMENT HAS NOT EXPIRED, OR WHO ALLEGES A *PRIMA FACIE* CASE OF VIOLATION OF ACADEMIC FREEDOM IN THE NONRENEWAL OF HIS CONTRACT. If he *has* tenure or an unexpired appointment extending beyond the period of the proposed dismissal, the burden of proof is upon The Administration to show adequate cause why he should be dismissed. If he does *not* have tenure, but contends that the nonrenewal of his contract constitutes a violation of his academic freedom, the burden of proof is upon the faculty member." (Capitalization supplied; italics in original.)

cedural due process, are the same whether the teacher has contractual status or, like Mrs. Duke, lacks that status. Contractual status goes to entitlement to a hearing, but once entitlement exists, whether by operation of law or by grace, the differences are at an end. Thus, even if the university was not required to adhere to the "Statement," it was a source of suspicion from the beginning that with an established procedure available in which the faculty participated, the administration chose instead to follow an *ad hoc* procedural scheme never before employed that excluded faculty and placed the case in the hands of administrators. It was this exclusion of the faculty rather than any contention that the "Statement" governed which, from the beginning, caused the university's chapter of the American Association of University Professors (AAUP) to take the position that procedural due process was not being employed. Summarizing, I do not say that the hearing was *required* to be before the Tenure Committee. I do say, first, that there is a serious question of whether the university was correct in assuming that the hearing was *not required* to be before the Tenure Committee; and, second, even if the assumption was correct, the decision to bypass the available and approved hearing system in favor of an *ad hoc* procedure never before employed and wholly excluding faculty participation, contributed to the lack of the essential apparent impartiality.

(2) Mrs. Duke conferred with the local chapter of AAUP, which appointed a committee of university faculty members chaired by Dr. Clovis Morrisson, a lawyer, a former practicing attorney, member of the political science department, and faculty advisor to pre-law students. At no time did the AAUP Committee take a position on the merits of Mrs. Duke's case or approve of her views or her language, but dealt with only the procedures under which the case should be handled.[7] The AAUP Committee requested of Dr. Carter that the hearing body be the Tenure Committee rather than the Cabinet. Carter agreed to, and did, relay that request to the Chairman of the Board of Regents. It was rejected. No explanation was then offered other than the fact that Mrs. Duke lacked tenure (and was between appointments). In the District Court an additional explanation was offered, that the date, physical arrangements and court reporter for a hearing already were arranged for.

(3) The AAUP Committee then asked to be allowed merely to attend the hearing. This too was denied. No reason was then or is now given for excluding from the hearing local faculty members representing the established and traditional organization of the university teaching profession.

In this case one need not speculate about the absence of apparent impartiality. The position of AAUP that the Cabinet was the wrong tribunal, that the Tenure Committee was an appropriate tribunal, that in no event should the hearing be before a group composed solely of administrators and from which faculty members were excluded, and that the hearing should not be closed, is the "proof of the pudding." Drawn from the class to whom the "appearance" of impartiality was directed, and by virtue of their committee membership having their attention sharply focused on the situation, this committee was unable to perceive "apparentness" to be present.

(4) As already pointed out, the Cabinet consisted of Acting President Carter and Vice-Presidents Lindsley, Spurlock and Rogers. In early August, Carter had instructed Lindsley to investigate the actions of Mrs. Duke which are the subject of this suit, and Lindsley had done so. Spurlock also had taken some part in the investigation. When President Carter reported the results of the investigation to the meeting of the Regents, Lindsley and Spurlock were pres-

---

7. In fact, Dr. Morrisson, whose fate I will discuss later, publicly and in writing disapproved of her language.

ent. The Regents did not unequivocally direct President Carter to withdraw the offer to Mrs. Duke. Rather they instructed him to investigate further the "facts" as reported to them and to satisfy himself whether they were "true facts," and, if they were, then to "dismiss" her. President Carter made further investigation, satisfied himself, and on August 25 took action as he had been directed. A month later he sat as senior and presiding member of the hearing body which, on conflicting testimony, decided the same general issues as those previously submitted to him for one-man decision and then determined by him to be true.

(5) Following the hearing before the Cabinet, proposed findings were prepared by the Assistant Attorney General serving as counsel for the university and forwarded to Mr. Carter.

(6) On October 30, five weeks after the hearing, no decision having been handed down, Mrs. Duke's counsel wrote the President, asking a prompt decision. The Cabinet released its decision November 5.

(7) Mrs. Duke noted an appeal to the Board of Regents on November 11 and requested a prompt decision. On January 12, after waiting two months for a hearing to be scheduled, her counsel again asked a prompt hearing. On January 23 the Regents for the first time proposed a hearing date, in late February. The hearing eventually took place on February 26, and purportedly consisted of a review of the transcript of the Cabinet hearing.[8] On March 1 the Regents upheld the Cabinet decision. Thus an institutional remedy, one of whose purposes is prompt amelioration or decision within the university community of strains and conflicts, had consumed from beginning to final decision more than six months. During that time Mrs. Duke, a divorced woman with two small children and nominal income, was without employment.

(8) One of the most disturbing aspects of this case is what I now discuss. Mrs. Duke was notified that the appeal before the Regents would consist of a review of the transcript and that there would be no evidence or witnesses. But, on February 19, by letters marked "Personal and Confidential," President Carter mailed to each member of the Board of Regents an extract from the February 17–March 2 issue of "Denton's New World Press," purporting to be an article written by Mrs. Duke. It appears as footnote 6 of the majority opinion. The article attacks the university administration in general. More specifically, it bitterly assails the Regents for "stalling" in Mrs. Duke's case. It describes them as "all white, all men, all rich," and accuses them of "run[ning] the university as they and their class run the world." Most significantly, the article says:

> The regents are indeed guilty of immoral acts. They are criminals and their crimes are far more serious than m____ f____. They insist on maintaining an imperialistic, militaristic, racist, sexist system which causes ⅔ of the people to go to bed hungry every night. The Board of Regents turns students at NTSU into robots, like themselves, whose fate is to become managers of a system which is already doomed to extinction.
> These criminals find it necessary to engage in severe repression when their system is threatened . . . .

It was egregiously wrong that, within two or three days of the hearing at which the Regents were to consider the appeal, they should be, ex parte and without notice to or knowledge of the appellant, furnished this inflammatory document that had been published months after the Cabinet hearing. It

8. On February 26, the date of the hearing, President Carter wrote each member of the Board stating that he was enclosing a copy of the decision of the Cabinet, and apologizing for having failed to distribute copies earlier. Thus it is not even clear that the Regents saw the written decision that they were reviewing, and, if they did, it would appear that it was hand delivered on the day of the hearing.

asks too much of the Regents, in reviewing a record in which there was a conflict in testimony as to what Mrs. Duke had said of them and of the university administration in general, that they should be able to divorce what the record said and what the article said, or that they maintain requisite impartiality in the face of the remarks directed at them in the article. Though the judicial mind is trained to be more nearly capable of straining out what should not be considered, no panel of this court would sit in judgment in like circumstances. Certainly we would not entertain being privately furnished with such a document. This is not to say that institutional hearing bodies are expected to perform with the same carefully attuned responses as do courts. The point is that what happened demonstrates the necessity of separating those who were the victims of Mrs. Duke's remarks from the function of trying and reviewing her case.

(9) The plaintiff contends that the Regents took punitive action against Dr. Morrisson because of his participation in Mrs. Duke's case, thereby demonstrating that the Cabinet, as a subordinate body, and President Carter, could not act free of domination or fear of reprisal. The same point goes, of course, to the issue of the Board's disqualification to act as reviewing body. The conclusion of my brothers that the Cabinet cannot be deemed biased because the Board of Regents passed over Dr. Morrisson for promotion misses the point that the Regents too were required to be free of actual bias and possessed of apparent impartiality.

In addition to his actions already described, Dr. Morrisson had an audience with the Chairman of the Regents in mid-October. In February, having learned that the Regents would conduct their hearing later that month, he wrote the Chairman expressing ACLU's continuing interest in the due process aspects of her case but stating it would not ask that a representative attend. On April 2, after the Regents had upheld the Cabinet, he made a formal report of the Committee to the AAUP chapter of the university, sending a copy to President Carter. It stated that a serious breach of academic due process had occurred and that exclusion of the faculty from the matter had not been justified. On April 7 Dr. Carter sent a copy of the report to each Regent and suggested it be discussed at the next meeting. The April 2 report and other correspondence, requests and reports of the Morrisson Committee are in the record. They are models of discretion, courtesy and deference. They are dignified, reasonable and restrained in tone and in no way offensive or inappropriate.

Less than a month later the Regents passed over Dr. Morrisson for promotion from Associate Professor to full professor. Dr. Morrisson testified in the District Court that the promotion was recommended by his department, his dean and in some fashion at least by the Academic Vice-President but "was denied by the Board of Regents for reasons which, according to Acting President Carter, bore in part a direct relation to this case and my activities in it." President Carter testified at the trial in this case. Dr. Morrisson's testimony stands unrefuted.

The evidence reveals that after the Regents declined promotion to Dr. Morrisson, he met with President Carter. At Carter's suggestion he submitted specific written comment upon certain of his activities of the past year. Two of the matters upon which comment was suggested, and given, were Dr. Morrisson's appearances in federal and state courts, under subpoena, as a witness in proceedings involving Mrs. Duke, and his identification with the AAUP Committee report of April 2. It is hardly reasonable to suppose that his comments upon these matters would have been invited had they had not been factors in the decision of the Regents to deny him promotion. Dr. Morrisson's comments are somewhat tangential. But they are like a breath of fresh air in this complex of responsibilities misunderstood by both sides, and they deserve repetition.

3. My testimony on behalf of Mrs. Duke and Mr. Haylon in both State and Federal District Courts. Copies of the two subpoenas served on me are attached. To fail to testify would have subjected me to punishment for contempt of court. To lie on the witness stand would not have been possible for me.

4. [Comment upon the AAUP report of April 2, 1971]

\* \* \* \* \* \*

From the very beginning we [the AAUP Committee] made one simple point: that she was entitled to a hearing before a faculty committee. At no time did we express agreement with Mrs. Duke's views on society or her actions. You asked me during our initial discussion of this case, in September, if I endorsed Mrs. Duke's views, as expressed in her speeches. I told you then that I did not, I testified in Judge Scofield's court that I did not, and I tell you here again that I do not. I only support her right to have those views and to have what AAUP clearly considers a fair hearing to determine if her expression of those views had prejudiced her continued effectiveness in the classroom. That position of AAUP is a national one, it has been carefully worked out by the organization, and AAUP's 1940 Statement on Academic Freedom has been endorsed by virtually every organization having anything to do with higher education.

\* \* \* \* \* \*

Thank you again, John, for our discussion of yesterday, and for agreeing to consider asking the Regents to reconsider their decision. I shall abide by your decision, and theirs, and shall continue to urge my friends to do the same.

We have encouraged institutional remedies for the sake of the institutions themselves and as a means of ending disputes short of the doors of our busy courtrooms. Wood v. Alamo Heights Ind. School Dist., 433 F.2d 355 (5th Cir. 1970); Lucas v. Chapman, 430 F.2d 945 (5th Cir. 1970); Ferguson v. Thomas, *supra*; Stevenson v. Board of Educ., 426 F.2d 1154 (5th Cir.), cert. denied, 400 U.S. 957, 91 S.Ct. 355, 27 L.Ed.2d 265 (1970). If those purposes are to be realized, the institution must do better, and we must do better, than in this case.

## ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

PER CURIAM:

The Petition for Rehearing is Denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is Denied.